# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IBIO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10256-VCMR |
| | ) | |
| FRAUNHOFER USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 29, 2016
Date Decided: July 29, 2016

Mary B. Graham, Megan Ward Cascio, Thomas Curry and Anthony D. Raucci of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Plaintiff iBio, Inc.*

Robert J. Katzenstein of SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Thomas C. O'Brien, Kimberly L. Scott and David D. O'Brien of MILLER CANFIELD PADDOCK & STONE, Ann Arbor, Michigan; *Attorneys for Defendant Fraunhofer USA, Inc.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This decision sprouts from a dispute regarding the extent of discovery to which the plaintiff is entitled, but has significance that extends far beyond that. Plaintiff iBio, Inc. and defendant Fraunhofer USA, Inc. are two biopharmaceutical companies that have enjoyed a relatively successful commercial relationship. The parties' relationship stagnated and then came crumbling down when a third-party company—PlantForm Corporation—entered the picture. Fraunhofer agreed to provide PlantForm—which also happens to be one of iBio's competitors—with certain products and services. iBio then sued PlantForm and, after Fraunhofer intervened in that action, sued Fraunhofer as well, claiming that they were interfering with iBio's contractual rights and misappropriating iBio's intellectual property. Although iBio and PlantForm settled, the parties' dispute pressed on.

In this decision, the Court addresses the following threshold question: "What is the scope of the technology in Fraunhofer's possession -- under all of the relevant agreements between the parties -- to which iBio has ownership rights and to which iBio is entitled to receive a transfer from Fraunhofer?"[1] For the reasons stated in this Memorandum Opinion, I resolve that threshold question in iBio's favor.

---

[1] *iBio, Inc. v. Fraunhofer USA, Inc.*, C.A. No. 10256-VCMR, at 7-8 (Del. Ch. Jan. 6, 2016) (TRANSCRIPT).

## I.  BACKGROUND

The parties largely do not dispute the underlying facts.  Instead, they focus their attention on their competing interpretations of the relevant agreements between the parties.  For simplicity's sake—and because the facts of this case do not bear on this decision's ultimate resolution—I recount the facts as pled in the Verified Amended Complaint (the "Complaint").  I do so without drawing inferences in either party's favor and mostly for background and contextual purposes.  From a procedural standpoint, I treat it as a stipulation for decision on the merits on the record submitted.[2]

### A.  Parties

Plaintiff iBio, Inc. ("iBio") is a Delaware corporation that "develops and commercializes plant-based technology, and products derived from such technology, for human biopharmaceuticals and other applications."[3]

Defendant Fraunhofer USA, Inc. ("Fraunhofer") is a Rhode Island non-profit corporation that owns and operates several scientific research centers throughout

---

[2]  *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 18 (Del. Ch. 2005) ("[U]nder Court of Chancery Rule 56(h), since neither party argues that there is a disputed material issue of fact, the court deems the cross-motions to be the equivalent of a stipulation for decision on the merits on the record submitted. Thus, the usual standard of drawing inferences in favor of the nonmoving party does not apply." (citing Ct. Ch. R. 56(h))), *aff'd*, 903 A.2d 728 (Del. 2006).

[3]  Compl. ¶ 1.

the United States, including the Fraunhofer USA Center for Molecular Biotechnology (the "Center") located in Newark, Delaware. The Center conducts research and development in a number of scientific disciplines, including pharmaceutical biotechnology.

## B. Facts

### 1. The parties begin their commercial relationship

According to the Complaint, in the early 2000's, iBio sought to develop nascent plant-based technology to make proteins for human vaccines and other biotherapeutics.[4] In particular, iBio allegedly was looking for scientists who would, under iBio's direction, develop such technology and "a commercially viable, cost-effective, reliable, scalable process that would make a consistent product."[5] As a result, iBio allegedly engaged Fraunhofer in 2003 to perform that work through the Center.[6]

### 2. The parties' commercial relationship yields new technologies

The Complaint alleges that Fraunhofer was a "captive contractor" for iBio.[7] Specifically, iBio claims that it provided and facilitated tens of millions of dollars

---

[4]    *Id.* ¶ 18.

[5]    *Id.*

[6]    *Id.* ¶ 19.

[7]    *Id.* ¶ 21.

3

in funding as well as technical direction and assistance for Fraunhofer to engage in full-time development work for iBio.[8] iBio allegedly entered this relationship with the goal of having Fraunhofer develop the plant-based biopharmaceutical technology for iBio's exclusive ownership.[9]

The parties' relationship is governed by a series of agreements. All told, iBio and Fraunhofer entered into at least twenty-seven agreements—including supplemental agreements, addendums, and amendments—between 2003 and 2014 (the "Agreements").[10] The most relevant of those Agreements, for purposes of this action, are as follows: the Technology Transfer Agreement, effective January 1, 2004 (the "TTA")[11]; Research Agreement #1, effective October 15, 2004

---

[8] *Id.*

[9] *Id.*

[10] Pl.'s Opening Br. App. at A1-279, B1-5; *see also* Oral Arg. Tr. 60 ("There were eight major agreements between these parties that had upwards of 72 supplements and amendments over time on things unrelated to our present controversy."). Although some of the Agreements name parties other than iBio and Fraunhofer— excluding the applicable third-parties in the non-bilateral Agreements—iBio and Fraunhofer appear to be operating under the assumption that those entities are either related or predecessor entities such that iBio and Fraunhofer are bound under each Agreement. *See, e.g.,* Def.'s Answering Br. 10-11 (noting that Fraunhofer's counterparty in the TTA—NuCycle Therapy, Inc.—is iBio's predecessor). Thus, because it is undisputed that iBio and Fraunhofer are bound by each of the Agreements, I accept that as a stipulated fact.

[11] Pl.'s Opening Br. App. at A1-12 ("TTA").

4

("Research Agreement #1")[12]; Research Agreement #2, effective June 1, 2006 ("Research Agreement #2")[13]; the Fourth Amendment of the TTA, effective August 20, 2007 (the "Fourth Amendment")[14]; the Fifth Amendment of the TTA, effective December 17, 2007 (the "Fifth Amendment")[15]; the Sixth Amendment of the TTA, effective September 17, 2008 (the "Sixth Amendment")[16]; the Transfer and License Agreement, effective November 3, 2008 (the "TLA")[17]; the Global Access Agreement, effective February 11, 2010 (the "GAA")[18]; the Research Services Agreement, effective December 31, 2010 (the "RSA")[19]; the trilateral Collaboration Agreement between the parties and the Health Ministry of Brazil, effective January 4, 2011 (the "Collaboration Agreement")[20]; the trilateral Material Transfer Agreement between the parties and Novici Biotech LLC, effective

---

[12]     *Id.* at A13-18 ("Research Agreement #1").

[13]     *Id.* at A39-42 ("Research Agreement #2").

[14]     *Id.* at A51-54 ("Fourth Amendment").

[15]     *Id.* at A55-56 ("Fifth Amendment").

[16]     *Id.* at A57-58 ("Sixth Amendment").

[17]     *Id.* at A59-71 ("TLA").

[18]     *Id.* at A72-81 ("GAA").

[19]     *Id.* at A82-107 ("RSA").

[20]     *Id.* at A108-34 ("Collaboration Agreement").

September 29, 2011 (the "MTA")[21]; the Master Services Agreement, effective June 3, 2013 (the "MSA")[22]; the Terms of Settlement for the Seventh Amendment of the TTA, effective June 30, 2013 (the "Terms of Settlement")[23]; and the Confirmatory Assignment, effective July 2, 2013 (the "Confirmatory Assignment").[24]

By the end of 2014, the parties' partnership had yielded at least twenty-four U.S. patents granted or applied for and sixty foreign patents granted or applied for. The parties also allegedly developed valuable unpatented aspects of the technology, including "extensive confidential data and other know-how," such as "the design and operation of prototype and pilot plants, information and expertise related to the manufacturing process with all its parameters, conditions, equipment, specifications, and standard operating procedures and information about what works and what does not work to improve protein yield and purity."[25]

---

[21]    Def.'s Answering Br., Ex. 11 ("MTA").

[22]    Pl.'s Opening Br. App. at A243-52 ("MSA").

[23]    *Id.* at A253-55 ("Terms of Settlement").

[24]    *Id.* at B1-5 ("Confirmatory Assignment").

[25]    Compl. ¶ 31.

6

### 3. A dispute arises between the parties regarding Fraunhofer's interactions with a third-party competitor of iBio's

In 2013, Fraunhofer entered into an agreement with PlantForm Corporation ("PlantForm"), a Canadian biotech company and a competitor of iBio.[26] That agreement allegedly required Fraunhofer to develop plant-made pharmaceuticals for PlantForm in violation of Fraunhofer's agreements with iBio, which, iBio avers, bound Fraunhofer to act exclusively for iBio in that field.[27] Fraunhofer also allegedly agreed to use iBio's technology in the performance of its duties for Plantform and to disclose and transfer iBio's proprietary information and intellectual property to PlantForm.[28]

### C. Procedural History

On October 17, 2014, iBio filed its initial complaint in this action against PlantForm and its President and CEO, Don Stewart, for tortious interference with contract, trade secret misappropriation, and unjust enrichment. On December 19, 2014, iBio filed an amended complaint against PlantForm and Stewart. In addition to the three original claims, that amended complaint included a fourth claim for tortious interference with business relations. Those two complaints sought to

---

[26]     *Id.* ¶ 62.

[27]     *Id.* ¶¶ 61-64.

[28]     *Id.*

prohibit PlantForm and Stewart from utilizing the technology that allegedly belonged to iBio and sought to compel PlantForm and Stewart to return that technology to iBio. iBio also sought monetary damages against PlantForm and Stewart.

On February 24, 2015, Fraunhofer moved to intervene in that action. iBio did not oppose the motion. On March 17, 2015, iBio filed a complaint in a separate action against Fraunhofer and its Executive Director, Vidadi Yusibov. That complaint asserted claims against the defendants for breach of contract, trade secret misappropriation, conversion, and violation of the Delaware Uniform Deceptive Trade Practices Act. On April 9, 2015, Vice Chancellor Parsons consolidated the two actions. iBio and PlantForm eventually settled their dispute in August 2015, and PlantForm and Stewart were dismissed with prejudice. On September 29, 2015, iBio filed its operative amended Complaint against Fraunhofer, which left the claims largely unchanged but dismissed Yusibov as a defendant. In the Complaint, iBio seeks the following:

> (i) a declaration that iBio is the exclusive owner of all rights in the developed technology and that Fraunhofer has no ownership rights in the developed technology; (ii) a declaration that iBio is entitled to immediate transfer of the technology and an accompanying order of specific performance requiring Fraunhofer to confirm transfer of title to all developed technology and to facilitate the transfer of all information concerning the technology to iBio; (iii) a declaration that Fraunhofer has no right to use iBio's technology except as expressly permitted in

8

the parties' agreements and an accompanying injunction against further unauthorized use; and (iv) monetary damages for harm incurred as a result of Fraunhofer's failure to transfer the technology and unauthorized use of the technology.[29]

The crux of the Complaint is that the agreements between the parties provide that iBio exclusively owns all of the patented and unpatented aspects of the technology and that Fraunhofer breached those agreements by refusing to transfer and improperly using iBio's technology in contravention of iBio's proprietary rights. As such, I bifurcated the action to resolve the following threshold question (the "Threshold Question") before proceeding with the rest of the case: "What is the scope of the technology in Fraunhofer's possession -- under all of the relevant agreements between the parties -- to which iBio has ownership rights and to which iBio is entitled to receive a transfer from Fraunhofer?"[30] The parties subsequently agreed to that approach[31] and submitted briefs supporting their competing interpretations of the Agreements. I then held oral argument on the Threshold

---

[29] Compl. ¶ 14.

[30] *iBio, Inc. v. Fraunhofer USA, Inc.*, C.A. No. 10256-VCMR, at 7-8 (Del. Ch. Jan. 6, 2016) (TRANSCRIPT).

[31] On January 14, 2016, the parties submitted a joint stipulation "agree[ing] with the procedure suggested by the Court." Stipulation and [Proposed] Order Regarding Briefing of the Threshold Question, Docket Item No. 136, at 1.

9

Question on April 29, 2016. This Memorandum Opinion contains my ruling on the

Threshold Question.

### D.    Parties' Contentions

According to iBio, the TTA, the Fourth Amendment, and the TLA "contain

the most comprehensive and detailed descriptions of rights in the technology."[32]

iBio contends that those three Agreements demonstrate that the parties intended

that iBio be granted exclusive ownership of all technology that Fraunhofer

developed pursuant to the Agreements and required Fraunhofer to execute a

transfer to iBio of that technology. iBio also highlights the "operative provisions"

in certain of the other Agreements which "reaffirm the broad scope of iBio's rights

under the TTA and TLA."[33]    Finally, iBio argues that neither the Terms of

Settlement nor the Confirmatory Assignment limited or waived any of iBio's

ownership rights over the technology. As such, iBio proposes that the Threshold

Question be answered as follows:

> The scope of iBio's ownership rights to technology and
> rights to receive transfer of technology, pursuant to its
> agreements with Fraunhofer: (1) encompasses all
> proprietary rights of any kind to technology in the area of
> plant-based manufacturing technologies, techniques and
> methodologies and associated improvements, whether for
> the expression of vaccines and therapeutic proteins or

---

[32]    Pl.'s Opening Br. 5.

[33]    *Id.* at 5, 13-21.

10

> otherwise, whether previously owned by Fraunhofer, developed for iBio pursuant to the TTA, or otherwise; (2) is not limited to the 49 United States patents and patent applications listed in the 2013 Confirmatory Assignment; and (3) includes know-how.[34]

Fraunhofer, on the other hand, contends that iBio, in its Complaint, waived its claims to proprietary technology that was "developed by [Fraunhofer] for iBio pursuant to the TTA . . . in a defined field that excluded genetically-modified plants."[35] iBio discovery responses also purportedly "confirmed . . . that the disputed technology is limited to alleged proprietary know-how that does not rise to the level of a statutory trade secret."[36] In addition, Fraunhofer interprets the Agreements more narrowly than iBio. According to Fraunhofer, iBio only is entitled to specifically enumerated patents and patent applications rather than all the "know-how" and other peripheral intellectual property to which iBio claims a right. Fraunhofer highlights the Terms of Settlement and the Confirmatory Assignment as evidence that iBio released all claims beyond those forty-nine patent and patent applications. Finally, and in the alternative, Fraunhofer contends

---

[34]    *Id.* at 32.

[35]    Def.'s Answering Br. 1.

[36]    *Id.*

11

that iBio's right to receive a technology transfer from Fraunhofer is conditioned on certain "financial and other contract obligations" that iBio never fulfilled.[37]

## II.     ANALYSIS

### A.     Legal Standard

Resolution of the Threshold Question requires me to interpret the relevant Agreements' operative provisions to determine iBio's rights thereunder. "The proper construction of any contract . . . is purely a question of law."[38] "When interpreting a contract, the court's role is to effectuate the parties' intent based on the parties' words and the plain meaning of those words."[39] "Clear and unambiguous language . . . should be given its ordinary and usual meaning."[40] "Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."[41] Thus, "'[i]n upholding the intentions of

[37]     *Id.*

[38]     *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[39]     *Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. 2013) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

[40]     *Lorillard Tobacco*, 903 A.2d at 739 (quoting *Rhone-Poulenc*, 616 A.2d at 1195-96).

[41]     *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008).

the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.' The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[42]

"If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[43] If a contract is ambiguous, however, a court may consider extrinsic evidence, including "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."[44] "Contract language is not ambiguous simply because the parties disagree on its meaning."[45] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[46]

---

[42] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (quoting *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

[43] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[44] *Id.* at 1233.

[45] *E.I. du Pont de Nemours & Co., Inc. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

[46] *Rhone-Poulenc*, 616 A.2d at 1196.

**B.    The Agreements Entitle iBio to Broad Ownership Rights over the Technology**

**1.    The Unamended TTA supports Fraunhofer's interpretation of the Agreements**

The TTA is the first of the Agreements. The TTA, therefore, describes the initial framework of the parties' relationship. As implied by its name, the TTA contemplates an eventual transfer of certain technology from Fraunhofer to iBio. "Fraunhofer was to be the owner of the technology being developed and iBio was to be the exclusive licensee until November 2008, when iBio would have the option to make a 'Title Payment' and thereupon become the owner of the technology."[47]

The TTA's framework is set out at a high level in the TTA's Recitals.[48] In its First Recital, the TTA states as follows:

> Fraunhofer owns and will endeavor to develop certain exclusive rights to the proprietary technology and intellectual property specifically described in Appendix A (the "Technology") in the area of expression, engineering, testing, production and validation of human vaccines, human antibodies and human therapeutic proteins in plants (the "Field"); The Field does not

---

[47]    Pl.'s Opening Br. 5-6 (citing TTA §§ 2.1, 3.3).

[48]    Although the Court generally looks to an agreement's recitals when the operative provisions are ambiguous, *see Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 822-23 (Del. 1992), "recitals [that] appear to include substantive, definitional language that is consistent with the" agreement's other provisions "should not be ignored." *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *7 (Del. Ch. Sept. 17, 2015).

14

include industrial biocatalysis, veterinary applications, diagnostic applications, both human and other, agricultural and environmental applications . . . .[49]

That Recital is relevant not only because it informs the Court as to the default position at which the parties began when their relationship first started, but also because it defines two terms—"Technology" and "Field"—which are important to this dispute and defined in varying ways throughout the Agreements. The TTA's Second Recital describes the ultimate technology transfer that the parties anticipate, stating that "[iBio] desires to acquire the Technology, subject to the retention of certain rights in the Technology by Fraunhofer, in the Field in accordance with the terms and conditions of this Agreement."[50]

The mechanisms that effectuate the TTA's framework are laid out in detail in Sections 2.1 and 3.3. Section 2.1(a) provides that "Fraunhofer grants to [iBio] an exclusive license to use and to develop products derived from or incorporating the Technology in the Field."[51] Section 3.3 requires iBio to pay Fraunhofer the "Title Payment" of $250,000 on November 2, 2008 in exchange for "full title to the Technology and Improvements," in addition to other "Additional Payments"

---

[49] TTA, First Recital.

[50] *Id.*, Second Recital.

[51] *Id.* § 2.1(a).

15

that iBio is obligated to make after the technology transfer.[52]  And, although the TTA grants iBio title to the Technology and Improvements upon making the Title Payment, Section 2.1(b) reserves for Fraunhofer "a perpetual, world-wide, royalty-free license to . . . (i) perform research utilizing the Technology or Improvements, in any field, on a non-exclusive basis; and (ii) commercialize the Technology and Improvements for application outside of the Field on an exclusive basis."[53]

Finally, Appendix A to the TTA, titled "Licensed Technology," begins with an introductory clause: "[t]he following patent applications filed by Fraunhofer prior to the effective date of this Agreement and license rights held by Fraunhofer on the date of this Agreement, to the extent the intellectual property described therein applies to the Field."[54]  Appendix A then lists the five relevant patent applications that Fraunhofer presumably had pending at the time, the license rights to peptide technology that Fraunhofer held on that date, and "[a]ll patent applications claiming inventions in the Field filed by Fraunhofer . . . between the date of this Agreement and December 31, 2008, to the extent the intellectual property described therein applies to the Field."[55]

---

[52]     *Id.* § 3.3.

[53]     *Id.* § 2.1(b).

[54]     *Id.*, App. A.

[55]     *Id.*

16

Standing alone, therefore, the TTA appears to favor Fraunhofer's interpretation of the scope of the Technology. Upon making the Title Payment, iBio was entitled to Technology and Improvements. Appendix A, which is incorporated by reference into the definition of Technology, includes only current and future patent applications and license rights. Section 6.1 defines "Improvements" as "all modifications, revisions, additions, customizations and enhancements" made by Fraunhofer to the Technology.[56] Those definitions do not include iBio's broader claims of intellectual property rights, such as know-how.

I note, however, that Section 6.2 obligates Fraunhofer to protect its "Intellectual Property Rights in the Technology and . . . Improvements in the Field."[57] Section 6.2 subsequently defines "Intellectual Property Rights" as follows:

> [A]ny and all proprietary rights provided under: (i) patent law; (ii) copyright law; (iii) trademark law; (iv) design patent or industrial design law; or (v) any other statutory provision or common law principle applicable to this Agreement, including trade secret law, which may provide a right in either ideas, formulae, algorithms, concepts, inventions or know-how generally, or the expression or use of such ideas, formulae, algorithms, concepts, inventions or know-how.[58]

---

[56]  *Id.* § 6.1.

[57]  *Id.* § 6.2.

[58]  *Id.*

This Section can be interpreted in two conflicting ways.

The fact that the TTA required Fraunhofer to protect those Intellectual Property Rights may imply that the parties intended that iBio receive the benefit of those Rights, either through the ultimate technology transfer or through some other, more informal method. Alternatively, the fact that Intellectual Property Rights were not included along with Technology and Improvements in the technology transfer, despite being defined explicitly in the TTA, may indicate that the parties intended the Intellectual Property Rights *not* be transferred from Fraunhofer to iBio.[59] Because the second of these two contrary interpretations of Section 6.2 is more reasonable, I conclude that the TTA favors Fraunhofer's interpretation of the Agreements.[60] Although the parties' competing, reasonable interpretations of the TTA may indicate ambiguity, I need not resort to extraneous evidence because the Fourth Amendment eliminates that ambiguity in iBio's favor.

---

[59] *See Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (citing ARTHUR L. CORBIN, 3 CORBIN ON CONTRACTS § 552 at 206 (1906) ("If one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded.")) (applying the rule *expressio unius est exclusio alterius* in the contract interpretation context).

[60] *But see* Oral Arg. Tr. 67 ("THE COURT: . . . Does the fact that Section 6.2 of [the TTA] obligate[s] Fraunhofer to maintain and protect intellectual property rights imply that those rights were going to be transferred to iBio? [Fraunhofer's Counsel]: They might be, yes. . . . Yeah, I think that's fair.").

18

### 2. The Fourth Amendment supports iBio's interpretation of the Agreements

The TTA cannot be interpreted on a standalone basis because it has been supplemented and amended numerous times. Notably, the parties entered into the Fourth Amendment to extend Fraunhofer's obligation to continue developing technology through the end of 2014.[61] The Fourth Amendment also appears to expand the scope of the technology transfer. Section 1 confirms that iBio is entitled to receive "full title to the Technology and Improvements with exclusive rights in the Field upon making the November 2008 Title Payment.[62] Section 1 also provides, in relevant part, that Fraunhofer "will continue until December 31, 2009 to enhance the Technology and *Intellectual Property* related to the Technology and Improvements for [iBio] and formally to transfer and convey rights thereto to [iBio] as and when requested by [iBio]."[63]

Further, Section 2 states as follows:

> "During the five (5) year period commencing January 1, 2010 . . . and ending December 31, 2014, Fraunhofer shall (i) further develop exclusively for and transfer to [iBio] rights to proprietary technology and Intellectual Property Rights (the "Technology") in the area of expression, engineering, testing, production and

---

[61]    Fourth Amendment §§ 2, 6.

[62]    *Id.* § 1.

[63]    *Id.* (emphasis added).

> validation of human vaccines, human antibodies and human therapeutic proteins in plants, veterinary applications of plant-based influenza vaccines, including commercial process and production techniques and methodologies related to those applications; (ii) facilitate technology transfer and implementation by or for [iBio]; and (iii) provide access to Fraunhofer personnel and facilities, as appropriate, to support [iBio] efforts to commercialize the Technology.[64]

Similar to the TTA, the Fourth Amendment confirms that "Fraunhofer reserves the rights to the commercial process and production techniques and methodologies for applications outside of the Field."[65] Finally, Section 10 states that "[u]nless otherwise provided in this Amendment . . . the defined terms shall have the meanings attributed to them" in the TTA.[66]

The Fourth Amendment, therefore, appears to have amended the term "Technology," and, consequently, the scope of the technology to be transferred from Fraunhofer to iBio. As I observed above, the TTA only entitles iBio to a transfer of Technology and Improvements. The TTA also excludes Intellectual Property Rights from the definition of Technology. Under the Fourth Amendment, however, the definition of Technology includes Intellectual Property Rights. And, because Intellectual Property Rights are not defined in the Fourth Amendment, the

---

[64] *Id.* § 2.

[65] *Id.*

[66] *Id.* § 10.

20

TTA's definition of that term controls. Thus, it appears that both the technology transfer that iBio is entitled to upon making the Title Payment[67] and the additional Technology that Fraunhofer developed for iBio through December 31, 2014[68] include Intellectual Property Rights.[69] Because Intellectual Property Rights are defined broadly in the TTA,[70] I conclude that the TTA, as amended by the Fourth Amendment, supports iBio's interpretation of the Agreements.

### 3. The TLA supports iBio's interpretation of the Agreements

The TLA is the most hotly debated of the Agreements. iBio made the Title Payment, and the parties executed the TLA to effectuate the title conveyance contemplated by the TTA as of November 3, 2008. The TLA's Fifth Recital states as follows:

> [T]he Parties now desire to enter into this Agreement by which (i) Fraunhofer shall transfer to [iBio], full title to the Technology and Improvements (as defined below); and (ii) [iBio] shall grant Fraunhofer a license to use such proprietary technology and intellectual property rights on a non-exclusive basis solely for research purposes and an

---

[67] *See* Fourth Amendment § 1; TTA §§ 2.1, 3.3.

[68] *See* Fourth Amendment §§ 2, 6.

[69] Section 1 of the Fourth Amendment refers to Intellectual Property rather than Intellectual Property Rights. *Id.* § 1. Neither the TTA nor the Fourth Amendment defines "Intellectual Property." That said, the inclusion of this term does not impact my analysis because Section 1 also include Technology, which the Fourth Amendment appears to have amended to include Intellectual Property Rights.

[70] *See supra* text accompanying note 58.

21

exclusive license to commercialize such proprietary technology and intellectual property rights outside of the Field (as defined below).[71]

"Technology" is defined as "the technology and Intellectual Property Rights (i) described in the patents and applications identified or (ii) otherwise referred to in the attached Appendix A."[72] "Improvements" is defined as "all modifications, revisions, additions, customizations and enhancements to the Technology, including all Intellectual Property Rights related thereto."[73] The term "Field" includes "the area of expression, engineering, testing, production and validation of human vaccines, human antibodies, human therapeutics, influenza vaccine antigens for veterinary use, and antibodies for influenza diagnostics produced in plants, including commercial process and production techniques and methodologies related to those applications" and excludes "industrial biocatalysis, reagent applications, veterinary applications, diagnostic applications, both human and other, agricultural and environmental applications, except as otherwise specifically

---

[71]     TLA, Fifth Recital.

[72]     *Id.* § 1.13.

[73]     *Id.* § 1.4.

provided" in the TLA.[74]   And, the TLA's definition of "Intellectual Property Rights" is identical to that term's definition in the TTA.[75]

### a.   Sections 2.1 and 8.1 and Appendix A to the TLA

The parties base their competing interpretations of the TLA on three main provisions.  The first of those provisions is Section 2.1, which states, in relevant part, that "Fraunhofer hereby assigns, transfers and delivers to [iBio] . . . all right, title and interest in and to the Technology and Improvements including the Intellectual Property Rights developed in connection with the Research Agreements."[76]  The "Research Agreements" include Research Agreement #1 and Research Agreement #2.  The parties entered into those Research Agreements to define the parameters of discrete projects that Fraunhofer performed on iBio's behalf.  Because both of the Research Agreements explicitly acknowledge that the technology developed pursuant to those Agreements fall within the scope of the TTA and shall be transferred to iBio under the TTA,[77] they can be viewed as supplemental to the TTA.

---

[74]   *Id.* § 1.3.

[75]   *Compare id.* § 1.5, *with* TTA § 6.2.

[76]   TLA § 2.1.

[77]   Research Agreement #1 § 2 ("[T]he parties hereby acknowledge that any intellectual property in the area of expression, engineering, testing, production and validation of human vaccines, human antibodies and human therapeutic proteins in

23

The second relevant provision is Section 8.1.  Under Section 8.1, "[a]ll right, title and interest in and to the Technology and Improvements, including the Intellectual Property Rights relating thereto, shall be and remain the sole and complete property of [iBio]."[78]   Section 8.1 also provides that "Fraunhofer recognizes and acknowledges [iBio's] exclusive ownership of the Technology and Improvements, including all the Intellectual Property Rights relating thereto" and requires Fraunhofer to "execute such additional documents as may be necessary to perfect [iBio's] ownership of such rights."[79]

The third and final provision is Appendix A to the TLA.  Appendix A, which is incorporated by reference into the definition of Technology, includes the following introductory paragraph:

> All technology and intellectual property in the area of plant-based manufacturing technologies, techniques and methodologies and associated improvements, whether for the expression of vaccines and therapeutic proteins or otherwise, whether previously developed or owned by

---

plants owned or controlled by Fraunhofer, and/or arising out of the work described in this Agreement, falls within the scope of the [TTA].  Fraunhofer shall and hereby does transfer all of the relevant rights to its inventions pursuant to that [TTA]."); Research Agreement #2 § 5 ("All of the Technology and Improvements created pursuant to the Prior Agreements (as modified and supplemented by this agreement) shall be included in the transfer or licensing of Technology and Improvements described in Section 3.3 of the [TTA].").

[78]    *Id.* § 8.1.

[79]    *Id.*

24

> [Fraunhofer], developed for [iBio] pursuant to the TTA,
> or otherwise, including, but not limited to the following
> patent applications and license rights held by
> [Fraunhofer] on the date of the [TTA].[80]

That paragraph is followed by the same patent applications and license rights that are included in Appendix A to the TTA. Appendix A to the TLA concludes with the following two sentences:

> All patent applications filed by [Fraunhofer] with regard to work product developed by [Fraunhofer] at any time under the TTA. Technology shall not include any intellectual property that is developed in whole or in part by the Fraunhofer Institute for Molecular Biology and Applied Ecology, which is headquartered in Aachen, Germany.[81]

Based on Sections 2.1 and 8.1 and Appendix A, Fraunhofer contends that the TLA only conveyed to iBio ownership of the patent applications and the license rights enumerated in Appendix A and the thirty-four patent applications that Fraunhofer had filed by November 2008 under the TTA.[82] iBio, on the other hand, interprets those provisions as entitling it to "all proprietary rights of any kind developed by Fraunhofer 'in the area of plant-based manufacturing technologies, techniques and methodologies and associated improvements, whether for the

---

[80] *Id.*, App. A.

[81] *Id.*

[82] Def.'s Answering Br. 15-16.

expression of vaccines and therapeutic proteins or otherwise, whether previously developed or owned by [Fraunhofer], developed for [iBio] or otherwise.'"[83] The parties agree that Section 2.1 is the operative provision that effectuates the TLA's title conveyance. And, the parties agree that the scope of the technology conveyed via Section 2.1 should be determined by reference to Appendix A. Their disagreement, therefore, hinges on the proper construction of Appendix A's introductory clause.[84]

According to Fraunhofer, the general statement in the opening paragraph of Appendix A is limited by the more specific, subsequent references in that Appendix. Although that opening paragraph indicates that iBio is entitled to "[a]ll technology and intellectual property,"[85] Fraunhofer points out that the definition of Technology is limited to patents, patent applications, and Intellectual Property Rights.[86] Because the phrase "[a]ll technology and intellectual property" does not identify or reference any patents, patent applications, or "proprietary rights under patent, copyright, trademark, design patent, or industrial law, or under any other statutory or common law principle," Fraunhofer contends that Appendix A's

---

[83]    Pl.'s Opening Br. 9 (quoting TLA, App. A).

[84]    Def.'s Answering Br. 15-18; Pl.'s Reply Br. 4-7.

[85]    TLA, App. A.

[86]    Def.'s Answering Br. 16 (citing TLA § 1.13).

26

introductory clause should be ignored in favor of that Appendix's enumerated patent applications, license rights, and reference to the "patent applications filed by [Fraunhofer] with regard to work product developed by [Fraunhofer] at any time under the TTA."[87]

In addition, Fraunhofer denies that the final phrase in Appendix A's opening clause—stating that the Technology "includ[es] but [is] not limited to the following [enumerated] patent applications and license rights"[88]—indicates "that the technology and intellectual property that follows is not a complete list of what was assigned to iBio."[89] Rather, Fraunhofer reads that phrase simply as differentiating between the "five patent applications and one set of license rights held by [Fraunhofer] on December 18, 2003"—*i.e.*, the date the parties entered into the TTA—and the patent applications that Fraunhofer filed based on work developed under the TTA, which "were clearly not held by [Fraunhofer] on the date of the original TTA, and thus fall outside the scope of the 'including but not limited to' clause."[90]

---

[87]     *Id.* at 16-17 (quoting TLA, App. A) (emphasis omitted).

[88]     TLA, App. A.

[89]     Def.'s Answering Br. 17.

[90]     *Id.* at 17-18 (quoting TLA, App. A).

Fraunhofer's reading of the TLA is flawed. As an initial matter, Fraunhofer strains the bounds of reasonableness to convince the Court that it should disregard the bulk of Appendix A's opening paragraph. Fraunhofer's position appears to be based on its view that the TLA's definition of Technology is limited to "patents and applications" and "Intellectual Property Rights."[91] Not so. The TLA states that "'Technology' shall include the technology and Intellectual Property Rights (i) described in the patents and applications identified or (ii) otherwise referred to in the attached Appendix A."[92] Accepting Fraunhofer's interpretation of that provision would require the Court to ignore the word "technology," which is an undefined term that implies that Technology includes more than Intellectual Property Rights and patents and applications. The Court also would be forced to ignore the presence of romanettes (i) and (ii), which indicate that the "technology and Intellectual Property Rights . . . described in the patents and applications identified" is a category of Technology separate from the "technology and Intellectual Property Rights . . . otherwise referred to in the attached Appendix A" rather than a modifier that limits the phrase "otherwise referred to in the attached Appendix A" to "patents and applications."[93]

---

[91] TLA § 1.13.

[92] *Id.*

[93] *Id.*

Based on this construction, the five patent applications enumerated in Appendix A constitute "patents and applications identified."[94] The license rights and the patent applications filed based on Fraunhofer's development work pursuant to the TTA constitute "technology and Intellectual Property Rights . . . otherwise referred to in the attached Appendix A."[95] And, Appendix A's initial clause— "[a]ll technology and intellectual property in the area of plant-based manufacturing technologies, techniques and methodologies and associated improvements, whether for the expression of vaccines and therapeutic proteins or otherwise, whether previously developed or owned by [Fruanhofer], developed for [iBio] pursuant to the TTA, or otherwise"[96]—certainly also constitutes "technology and Intellectual Property Rights . . . otherwise referred to in the attached Appendix A."[97] Appendix A's "including, but not limited to" language, therefore, extends beyond the patent applications that Fraunhofer filed pursuant to its development work under the TTA. Fraunhofer's alternative interpretation is disfavored because it would render Appendix A's opening clause superfluous.[98]

---

[94]     *Id.*

[95]     *Id.*

[96]     *Id.*, App. A.

[97]     *Id.* § 1.13.

[98]     *NAMA Hldgs.*, 948 A.2d at 419.

29

Further, iBio's interpretation of Appendix A is supported by Section 8.1 of the TLA. That Section—which Fraunhofer does not address in its brief—indicates that iBio owns "the Technology and Improvements, including the Intellectual Property Rights relating thereto."[99] The TLA's definition of Intellectual Property Rights is broad and includes "any and all proprietary rights provided under: (i) patent law; (ii) copyright law; (iii) trademark law; (iv) design patent or industrial law; or (v) any other statutory provision or common law principle applicable to [the TLA]."[100] Under Section 8.1, therefore, Fraunhofer acknowledges and agrees to "execute such additional documents as may be necessary to perfect" iBio's ownership of Intellectual Property Rights.[101] Fraunhofer, however, insists that the intellectual property TLA conveyed to iBio included only the patent applications and the license rights enumerated in Appendix A and the thirty-four patent applications that Fraunhofer had filed by November 2008 under the TTA.[102] In fact, Fraunhofer expressly denies that iBio is entitled to any "proprietary rights under patent, copyright, trademark, design patent, or industrial law, or under any other statutory or common law principle" because Appendix A does not make

---

[99]    TLA § 8.1.

[100]    *Id.* § 1.5.

[101]    *Id.* § 8.1.

[102]    Def.'s Answering Br. 15-16.

30

explicit reference to any such rights.[103] Thus, while Fraunhofer's construction of the TLA would contradict Section 8.1, iBio's interpretation comports with it.[104] As a result, I conclude that Sections 2.1 and 8.1 and Appendix A all support iBio's interpretation of the Agreements.

### b. Fraunhofer's other arguments

Fraunhofer makes four additional arguments in opposition to iBio's interpretation of the TLA. First, Fraunhofer points out that the scope of the technology conveyed to iBio in the TLA is narrower than the technology licensed to iBio in the TTA. Specifically, Fraunhofer highlights the fact that the second to last paragraph of Appendix A to the TTA includes "'[a]ll patent applications claiming inventions **in the Field**' filed by [Fraunhofer] between the date of the TTA and December 31, 2008,"[105] whereas the last paragraph of Appendix A to the TLA includes "'[a]ll patent applications filed by [Fraunhofer] with regard to work product developed by [Fraunhofer] at any time **under the TTA**.'"[106] According to Fraunhofer, therefore, "[i]t simply makes no sense that when the parties plainly

---

[103] Def.'s Answering Br. 16-17 (emphasis omitted).

[104] *See GMG Capital Invs., LLC*, 36 A.3d at 779 ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." (quoting *E.I. du Pont de Nemours and Co., Inc.*, 498 A.2d at 1113)).

[105] Def.'s Answering Br. 19 (quoting TTA, App. A).

[106] *Id.* (quoting TLA, App. A).

31

narrowed the scope of the Technology conveyed, they also . . . expanded it to all plant-based technology and intellectual property."[107]

In reality, it is Fraunhofer's argument that "makes no sense." Under the transitive property of equality,[108] because (1) Appendix A to the TLA includes all patent applications that Fraunhofer filed under the TTA, and (2) because Appendix A to the TTA includes all patent applications filed in the Field, then (3) Appendix A to the TLA necessarily includes all patent applications filed in the Field. It is unreasonable, therefore, to interpret the TLA as narrower than the TTA. Further, Fraunhofer's argument, taken as true, actually lends additional credence to iBio's interpretation of Appendix A to the TLA. The TLA was intended to effectuate the title conveyance contemplated by the TTA. Fraunhofer contends that the phrase "patent applications filed . . . **under the TTA**"[109] excludes certain "patent applications claiming inventions **in the Field**,"[110] making the TLA narrower than the TTA. If that is true, then it makes more sense to interpret the opening paragraph in Appendix A to the TLA as extending iBio's ownership rights beyond the patent applications and the license rights enumerated in Appendix A and the

---

[107]    Def.'s Answering Br. 19.

[108]    Under the transitive property of equality, if a=b and b=c, then a=c.

[109]    TLA, App. A (emphasis added).

[110]    TTA, App. A (emphasis added).

32

thirty-four patent applications that Fraunhofer had filed by November 2008 under the TTA. Otherwise, the TLA's stated intent of effectuating the TTA's title conveyance would fail, as certain patent applications claiming inventions in the Field would be excluded from that conveyance.

Second, Fraunhofer highlights Section 9.2 of the TLA, which provides, in relevant part, as follows:

> Fraunhofer further represents, warrants and covenants to [iBio], and acknowledges that [iBio] has relied upon the completeness and accuracy of such representations, warranties and covenants in entering into this Agreement, that . . . during the period from January 1, 2004 through November 2, 2008, Fraunhofer has not created any Technology, Improvements or related Intellectual Property Rights other than those being assigned to [iBio] pursuant to this Agreement . . . .[111]

According to Fraunhofer, iBio's interpretation of the TLA would render Section 9.2 superfluous because "[i]f, as iBio says, the Technology and Improvements assigned under the TLA consisted of 'all technology and intellectual property in the area of plant-based manufacturing,' there could logically be no 'other' Technology and Improvements that were not assigned to iBio."[112] I disagree.

Although Section 9.2 may be somewhat redundant, its language is not superfluous to the extent that it provides iBio with additional comfort "that

---

[111]    TLA § 9.2.

[112]    Def.'s Answering Br. 20.

Fraunhofer had developed technology exclusively for iBio, and that everything developed was being transferred to iBio, not given to others or secretly retained by Fraunhofer for its own use."[113] Fraunhofer also ignores that regardless of whether the Court interprets the TLA's other provisions in Fraunhofer's or iBio's favor, their argument that Section 9.2 is superfluous applies with equal force. In other words, Section 9.2 provides that the "Technology and Improvements" only includes that which is being conveyed to iBio under the TLA, no matter the scope of the "Technology and Improvements." Section 9.2, therefore, does not bear on either party's interpretation of the TLA.

Third, Fraunhofer posits that three policy considerations counsel against iBio's broad interpretation of the TLA: (1) "[g]eneralized statements of intellectual property rights" do not provide "reasonable notice to the contracting parties, the public, and ultimately the courts, who are asked to determine and enforce intellectual property rights"[114]; (2) "broad, sweeping statements can be anti-competitive and an unlawful restraint on trade"[115]; and (3) "courts will not uphold

---

[113]  Pl.'s Reply Br. 8.

[114]  Def.'s Answering Br. 20 (citing *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 990-91 (S.D. Cal. 2012); *Schwan's Consumer Brands N. Am., Inc. v. Home Run Inn, Inc.*, 2005 WL 3434376, at*5 (D. Minn. Dec. 9, 2005)).

[115]  *Id.* at 21 (citing *Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 790 (8th Cir. 1996)).

agreements purporting to transfer or restrict knowledge in the public domain, as such agreements would impermissibly infringe on the free flow of information."[116]

As an initial matter, the cases that Fraunhofer cites are inapposite. Those decisions simply do not involve the contractual interpretation of agreements providing for the transfer of intellectual property rights. Further, the policies that Fraunhofer identified are not implicated by iBio's interpretation of the TLA because the parties are sophisticated commercial actors that agreed to a reasonably precise description of the scope of the technology at issue. Just because all of the technology conveyed to iBio is not enumerated in the TLA does not render that Agreement vague or overly broad. And, the TLA only conveys to iBio ownership of intellectual property rights that are protected under relevant intellectual property laws.[117]

Fourth and finally, Fraunhofer contends that the Court should reject iBio's interpretation of the TLA because it "would lead to a patently absurd result" that "[n]o reasonable person would have expected . . . when executing the TLA."[118]

---

[116] *Id.* (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989)).

[117] *See* TLA § 1.5 (limiting the TLA's definition of "Intellectual Property Rights" to "proprietary rights provided under" various bodies of intellectual property law).

[118] Def.'s Answering Br. 22 (citing *Finger Lakes Capital P'rs, LLC v. Honeoye Lake Acq., LLC*, 2015 WL 6455367, at *8 (Del. Ch. Oct. 26, 2015)).

Fraunhofer maintains that none of the Agreements that preceded the TLA entitled iBio to the same, broad intellectual property rights to which iBio claims ownership under the TLA.  Yet, according to Fraunhofer, iBio's required payments under the TLA do not reflect the value of the technology that iBio seeks.  As such, Fraunhofer points out that "[i]f [it] had actually agreed to assign to iBio all rights [Fraunhofer] had ever held or developed for anyone in all technology and intellectual property in the area of plant-based manufacturing"—which may preclude Fraunhofer from performing such services for any other party and force the Center to shut down—then it would have sought equivalent compensation.[119]

Fraunhofer's position, however, rests on one fatal premise: that iBio interprets the TLA as expanding the scope of the relevant technology far beyond what was contemplated by prior Agreements.  On the contrary, the scope of the technology described in the TLA is consistent with the TTA, as modified by the Fourth Amendment.  The Fourth Amendment entitles iBio to all "proprietary technology and Intellectual Property Rights in the area of expression, engineering, testing, production and validation of human vaccines, human antibodies and human therapeutic proteins in plants, veterinary applications of plant-based influenza vaccines, including commercial process and production techniques and

---

[119]     Def.'s Answering Br. 22.

methodologies related to those applications."[120] The TLA entitles iBio to "[a]ll technology and intellectual property in the area of plant-based manufacturing technologies, techniques and methodologies and associated improvements, whether for the expression of vaccines and therapeutic proteins or otherwise, whether previously developed or owned by [Fraunhofer], developed for [iBio] pursuant to the TTA, or otherwise."[121] "To the extent technology is described more broadly in the TLA than the original TTA, the description reflects that the TTA was written at the outset of the parties' relationship while the TLA was written after years of development work."[122]

The parties also dispute whether the $17 million that iBio allegedly paid to Fraunhofer under the Agreements[123] is commensurate with the ownership rights iBio claims under the TLA. Fraunhofer, for its part, maintains that "[p]harmaceutical research is not inexpensive" and that "[t]he payments iBio made under the TTA for over a decade of research and development are not at the high end of what this Court has seen."[124] Because I conclude that the TLA, on its face,

---

[120]    Fourth Amendment § 2.

[121]    TLA, App. A.

[122]    Pl.'s Reply Br. 14.

[123]    Compl. ¶ 4.

[124]    Def.'s Answering Br. 21-22.

unambiguously expresses the parties' intent regarding the scope of the technology being conveyed to iBio, I decline to entertain any arguments regarding the sufficiency of the corresponding consideration in the context of other, similar such agreements.[125]

### 4. The other Agreements do not support Fraunhofer's interpretation of the Agreements

The parties also debate whether the Fifth Amendment, the Sixth Amendment, the GAA, the RSA, and the Collaboration Agreement bear on the Threshold Question. As to both the Fifth Amendment and the Sixth Amendment, Fraunhofer highlights the clause in their Recitals that states "[p]ursuant to the Prior Agreements, **Fraunhofer** has developed, validated and filed patents covering a proprietary platform technology (referred to in the Prior Agreements as the 'Technology') that uses plants (which have not been genetically modified)."[126] According to Fraunhofer, that provision "confirms that the scope of the technology in which iBio would have ownership and transfer rights had not changed" from the original TTA.[127] Neither the Fifth Amendment nor the Sixth Amendment,

---

[125] *See Eagle Indus.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[126] Fifth Amendment, Recitals; Sixth Amendment, Second Recital.

[127] Def.'s Answering Br. 14.

however, amends Section 2(i) of the Fourth Amendment or impacts Section 2.1 of the TLA, both of which favor iBio's response to the Threshold Question. Thus, those two Agreements do not alter my analysis.

Further, under each of the GAA, the RSA, and the Collaboration Agreement, iBio provided to either Fraunhofer or another third-party a license to use iBio's technology to perform a discrete task.[128] Although those Agreements may describe, in passing, the technology conveyed between Fraunhofer and iBio under the TTA, the TTA's amendments, and the TLA, they do not alter the scope thereof. As such, because I conclude that the relevant provisions of the amended TTA and the TLA are unambiguous, and because the GAA, the RSA, and the Collaboration

---

[128] *See* GAA § 2(a) ("Subject to the terms and conditions of this Agreement, [iBio] hereby grants to [Fraunhofer] a fully-paid-up, non-exclusive, non-royalty-bearing license to the Technology solely for the purposes of (i) developing and manufacturing Global Health Vaccines anywhere in the world and (ii) marketing, using, and selling (or otherwise distributing) Global Health Vaccines for Global Access Objectives within GAVI Eligible Countries ('Field of Use')."); RSA § 2.2 ("Subject to the terms and conditions of this Agreement, [iBio] hereby grants to [Fraunhofer], during the Contract Period, a non-exclusive, non-assignable, non-sublicensable, limited, revocable license solely to access and use the Technology in order to perform the research for the Project, as set forth in this Agreement."); Collaboration Agreement § D(1) ("Subject to the terms and conditions hereof and of any amendment to this Agreement by which a license is extended to Other Products, and further to continued compliance with BIO-MANGUINHOS' obligations hereunder . . . , [iBio] hereby grants to BIO-MANGUINHOS . . . an exclusive, non-assignable, sublicensable, limited, revocable, royalty bearing license . . . .").

39

Agreement are extraneous Agreements that do not amend the TTA or the TLA, I decline to consider them in the context of the Threshold Question.[129]

### C. iBio Did Not Limit or Waive Its Ownership Rights in the Terms of Settlement or the Confirmatory Assignment

On June 30 and July 2, 2013, the parties executed the Terms of Settlement and the Confirmatory Assignment, respectively. According to Fraunhofer, these two Agreements fit together in that (1) the Confirmatory Assignment effectuated a conveyance of the forty-nine patents and patent applications that comprised the totality of the technology to which iBio is entitled under the TTA and the TLA and (2) the Terms of Settlement constituted a general release of any other obligations, rights, or claims that either of the parties had under any of the Agreements consummated to that point.

#### 1. The technology to which iBio is entitled under the TTA and the TLA is not limited to the Confirmatory Assignment

The parties dispute whether the Confirmatory Assignment is a valid contract.[130] I agree with Fraunhofer that given the Confirmatory Assignment's language—including its references to certain of Fraunhofer's covenants and iBio's

---

[129]    *See supra* note 125 and accompanying text.

[130]    Oral Arg. Tr. 54 ("[iBio's Counsel]: . . . And I think it's an interesting question of what Fraunhofer intends by its reference to the confirmatory assignment. . . . [I]n their answering brief, at times it seemed as though it might be extrinsic evidence. At other times it seemed like maybe they were treating this as part of the terms of settlement. But in any case, it is not an agreement. iBio did not sign it.").

rights[131]—it appears, on its face, to have some contract-like elements. That said, however, I disagree with Fraunhofer that the Confirmatory Assignment limited the technology to which iBio is entitled to ownership of under the TTA and the TLA. In its Recitals, the Confirmatory Assignment references the TLA and indicates that the parties "agreed, among other things, that certain technology and intellectual property rights developed by Fraunhofer would be owned exclusively by iBio."[132] The Recitals further noted that "the technology and intellectual rights assigned pursuant to the [TLA] include the inventions and improvements which are the subject of and described" in the Appendix to the Confirmatory Assignment.[133] The body of the Confirmatory Assignment then includes the operative provisions that purport to convey from Fraunhofer to iBio "Fraunhofer's entire right, title, and interest" in the forty-nine patents and patent applications listed in the Appendix in exchange for the "good and valuable consideration" that iBio provided to

---

[131]   *See, e.g.*, Confirmatory Assignment at 2 ("Fraunhofer covenants that it will, when requested, execute, deliver and acknowledge all such further instruments of conveyance. . . . This assignment shall inure to the benefit of iBio and its successors and assigns and shall be binding on Fraunhofer and its successors and assigns.").

[132]   *Id.*, First Recital.

[133]   *Id.*, Second Recital.

Fraunhofer.[134]   The Confirmatory Assignment concludes with a notary public's official seal witnessing and validating Fraunhofer's representative's signature.

Nothing in the Confirmatory Assignment indicates that the forty-nine enumerated patents and patent applications constitute the entirety of the technology conveyed from Fraunhofer to iBio under the TLA.   A plain reading of the Confirmatory Assignment comports with iBio's explanation that parties executed the Confirmatory Assignment to "permit recordation in the U.S. Patent Office of the transfer from Fraunhofer to iBio of the ownership of U.S. patents and patent applications."[135]

> **2.    The Terms of Settlement does not constitute a general release of all of the obligations, rights, or claims between the parties**

The Terms of Settlement is a two-page, seven-section settlement agreement with terms that parties indicated would be "work[ed] . . . into the Seventh Amendment to the TTA."[136]   Section 6 of the Terms of Settlement provides that "[t]he Parties mutually release each other from any other accrued claims arising

---

[134]    *Id.* at 1-5.

[135]    Pl.'s Opening Br. 30-31 (citing 35 U.S.C. § 261 (2012) (authorizing the assignment of a patent or patent application via a written instrument and noting that notarization of such written instrument "shall be prima facie evidence of the execution of an assignment, grant or conveyance of a patent or application for patent")).

[136]    Terms of Settlement, Recitals.

42

out of the Prior Agreements."[137]  Taken in isolation, this provision appears to be a general release.  Fraunhofer contends, therefore, that "iBio released any claims arising out of the parties' agreements," both known and unknown, including "claims relating to iBio's purported ownership of intellectual property that existed as of June 30, 2013" and "any claims after that date."[138]

Because the scope of the Terms of Settlement's release is at issue, "application of *ejusdem generis* [is] permissible."[139]  *Ejusdem generis* is a canon of contract interpretation that provides as follows:

> [W]here general language follows an enumeration of persons or things, by words of particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.[140]

Applying that canon to the release in Section 6 of the Terms of Settlement, I conclude that the generality of the release is limited by the specificity of the

---

[137]    *Id.* § 6.

[138]    Def.'s Answering Br. 29-33 (citing *Adams v.* Jankouskas, 452 A.2d 148, 156-57 (Del. 1982); *Hob Tea Room v. Miller*, 89 A.2d 851, 856-57 (Del. 1952)).

[139]    *In re IAC/InterActive Corp.*, 948 A.2d 471, 495 (Del. Ch. 2008).

[140]    *Id.* at 495-96 (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004)).

43

preceding sections.[141] Section 1 of the Terms of Settlement replaces an installment payment term with a lump-sum payment term, requiring iBio to pay to Fraunhofer $3 million under the MSA rather than three $1 million payments under the TTA.[142] Section 2 releases Fraunhofer's obligation to make a matching $3 million payment under the TTA.[143] Section 3 provides that "[i]n consideration for the present transfer by [Fraunhofer] to iBio, or release, of whatever existing claimed receivables (other than rent) of [Fraunhofer] from iBio that are not otherwise settled or released by other provisions of this Agreement," iBio is required to (1) form an entity, (2) transfer to that entity certain iBio intellectual property to commercialize anthrax vaccines, and (3) grant Frauhofer a 49% interest in that entity.[144] Section 4 "convert[s] any minimum additional payment" that Fraunhofer claims under the TTA "into a new agreement pursuant to which [Fraunhofer] will be entitled to receive payments on iBio revenues from the use of the technology"

---

[141]   *See Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2010 WL 1838608, at *8 (Del. Ch. Apr. 28, 2010) ("Even absent a true conflict, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate. Thus, it is an accepted principle that the general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given." (quoting 11 WILLISTON ON CONTRACTS § 32:10 (4th ed. 2009))).

[142]   Terms of Settlement § 1.

[143]   *Id.* § 2.

[144]   *Id.* § 3.

that iBio transfers to the entity referenced in Section 3.[145] Section 5 releases iBio's claims against Fraunhofer "for reimbursement of allocated IP costs" under the GAA and "for prior shortfalls in [Fraunhofer's] matching funding, as required by the TTA."[146] And, Section 7 states that "[t]he foregoing agreements are subject to ratification by the Board of Directors of both parties and Fraunhofer Gesellschaft management."[147]

Thus, all of the Terms of Settlement's provisions preceding Section 6 relate to claims between the parties regarding payment terms. Those provisions all either release or alter various of the parties' payment obligations under the Agreements, and, in the context of the Terms of Settlement's other sections, it appears that the Agreement's subject matter is confined to such obligations. I conclude, therefore, that rather than a general release, Section 6's "generically-worded 'other accrued claims' must be read as limited to payment obligations between the parties, given that the specific terms were all directed to payment obligations."[148]

---

[145] *Id.* § 4.

[146] *Id.* § 5.

[147] *Id.* § 7.

[148] Pl.'s Opening Br. 28.

45

## D. The MSA Does Not Create a Condition Precedent to iBio Receiving a Technology Transfer

Fraunhofer contends that "iBio is not entitled to an operational technology transfer until it has honored its financial obligations and the parties have executed a project addendum specifying the terms of the transfer."[149] Although Fraunhofer acknowledges that the Fourth Amendment obligates it to "facilitate technology transfer and implementation by or for [iBio],"[150] Fraunhofer maintains that the MSA amended that obligation "to require the parties to execute a 'project addendum' for any services [Fraunhofer] performed, including a technology transfer."[151] According to Fraunhofer, "[t]he project addendum must identify the

---

[149] Def.'s Answering Br. 33. The parties distinguish between a title conveyance—which was effectuated upon the parties' consummation of the TLA and under which ownership rights over the technology passed from Fraunhofer to iBio—and a technology transfer—under which the physical and peripheral items supporting the technology will be transferred from Fraunhofer to iBio. *See* Oral Arg. Tr. 13 ("[iBio's Counsel]: . . . [W]hen we talk about general technology transfer, we are talking about something that is well-known in the industry, certainly well-known to Fraunhofer, which is a process where you go into the facility of the person who has the technology -- and there's protocols for looking at lab notebooks and receiving information and things that the technical people would know what to do. So I'm distinguishing that from a paper transfer agreement, which we have, for example -- you know, in the TLA."); Def.'s Answering Br. 33 ("[A]lthough title has been transferred, iBio is not entitled to an operational technology transfer until it has honored its financial obligations and the parties have executed a project addendum specifying the terms of the transfer. . . . An operational technology transfer can be a time-consuming and expensive process.").

[150] *Id.* at 34 (quoting Fourth Amendment § 2(ii)).

[151] *Id.* (citing MSA §§ 1.1-1.2).

46

specific technology to be transferred, the scope of the services to be provided by [Fraunhofer] (including its responsibilities, deliverables, milestones, and protocols), and the budget and terms of payment for the services" before Fraunhofer executes any such technology transfer.[152]  To support its position, Fraunhofer highlights the MTA, under which Fraunhofer agreed, at iBio's request, to facilitate a technology transfer to a third-party, Novici Biotech LLC.[153]  iBio has not completed a project addendum for the technology transfer that it claims a right to under the amended TTA and the TLA, based on its understanding that the Agreements do not require any such project addendum.

I agree with iBio.  The amended TTA and the TLA conveyed ownership of the relevant technology to iBio.  Pursuant to that conveyance, the Fourth Amendment requires Fraunhofer to facilitate a technology transfer to iBio,[154] and the TLA requires Fraunhofer "to cooperate with [iBio], both during and after termination of [the TLA], so that [iBio] may enjoy to the fullest extent the right,

---

[152]    *Id.*

[153]    *See* MTA, Fourth Recital.

[154]    Fourth Amendment § 2(ii).

47

title and interest" in the technology conveyed under the TLA.[155]    That "cooperation" clause arguably includes a technology transfer.[156]

Further, the MSA's plain language indicates that it was not intended to create a condition precedent to iBio receiving a technology transfer.  The MSA supplements the TTA and "govern[s] the project activities between [Fraunhofer] and iBio for the development of pharmaceutical product applications of iBio's Technology (each, a 'Project')."[157]  Sections 1.1 and 1.2 of the MSA require a "Project Addendum" for any "Services" that Fraunhofer performs "in connection with a Project" and describe the minimum requirements for each Project Addendum.[158]  Taking those provisions together, the MSA only requires Project Addenda for Services Fraunhofer renders in connection with "the development of pharmaceutical product applications of iBio's Technology."[159]  Section 1.4 of the

---

155    TLA § 2.1.

156    *See also* TLA § 9.2(iii) ("Fraunhofer shall provide [iBio's] designated representatives and counsel full access to all of Fraunhofer's records and personnel relevant to the Technology and Improvements being assigned hereunder and shall otherwise cooperate and assist such [iBio] representatives and counsel with actions reasonably required to protect and accomplish *technology transfer* of the Intellectual Property Rights in the assigned Technology and Improvements." (emphasis added)).

157    MSA, Recital.

158    *Id.* §§ 1.1-1.2.

159    *Id.*, Recital.

MSA confirms that the Agreement's subject matter is limited to Fraunhofer's development Services, as that Section requires the parties to establish a "Joint Development Committee" to "plan, implement and oversee all development activities with respect to each Project Addendum."[160] As a result, and because the MSA is silent as to technology transfers, I decline to find that the MSA created a condition precedent to Fraunhofer's obligations in Section 2(ii) of the Fourth Amendment and Sections 2.1 and 9.2(iii) of the TLA.

The MTA does not alter the above analysis. The parties entered into the MTA before they entered into the MSA, so it is fair to assume that the MTA does not represent a project addendum under the MSA. The MTA also does not implicate a technology transfer between Fraunhofer and iBio, as it instead relates to a technology transfer from Fraunhofer to Novici Biotech LLC. Because the TTA and the TLA explicitly provide for a technology transfer from Fraunhofer to iBio and no similar provision exists in those Agreements for technology transfers to other, third-parties, it makes sense that the parties would enter into a separate agreement to facilitate such a third-party transfer.

---

[160] *Id.* § 1.4.2.

### E. iBio's Complaint and Discovery Responses Do Not Limit Its Contractual Arguments

Fraunhofer avers that iBio's statements in its Complaint and discovery responses "limit[] the scope of the technology at issue" in the following ways: (1) "iBio limits its claims to technology developed under the TTA"; (2) "iBio limits its claims to proprietary know-how"; and (3) "iBio specifies that the technology at issue is limited to 'launch vectors' and non-genetically-modified plants."[161] According to Fraunhofer, those statements constitute "[v]oluntary and knowing concessions of fact made by a party during judicial proceedings"—*i.e.*, "judicial admissions"—that are "binding both upon the party against whom they operate, and upon the court."[162] I review each of those three categories of statements *seriatim* and conclude that those statements do not limit iBio's response to the Threshold Question.

First, in the Complaint, although iBio at times appears to claim a right only to technology developed under the TTA,[163] iBio also, at other times, acknowledges

---

[161] Def.'s Answering Br. 3-4.

[162] *Merritt v. United Parcel Serv.*, 956 A.2d 1196, 1201-02 (Del. 2008).

[163] *See, e.g.*, Compl. ¶ 107 ("iBio is entitled to an order of specific performance, requiring Fraunhofer to confirm transfer of title to all technology developed pursuant to the TTA, as amended and supplemented, through December 31, 2014, and to facilitate technology transfer to iBio of all information concerning such technology.").

its comprehensive ownership rights over "[a]ll technology and intellectual property . . . whether previously developed or owned by [Fraunhofer], developed for [iBio] pursuant to the TTA, or otherwise."[164]  Hence, I disagree that the Complaint contains a judicial admission that iBio's claims are limited to technology developed under the TTA.

Second, Fraunhofer points to both the Complaint and to iBio's Responses to Fraunhofer's First Set of Interrogatories as evidence that iBio's claims are limited to "proprietary know-how" and exclude "proprietary rights under patent, copyright, trademark, and design patent or industrial design law."[165]  I agree that iBio's response to the Threshold Question confirms that its claims are limited to "proprietary" intellectual property rights over the technology.[166]  Nothing in iBio's Complaint or discovery responses, however, indicates that its claims are limited to "know-how."  In the Complaint, iBio alleges that its "proprietary rights in the technology include ownership rights to numerous patents and to valuable

---

[164]    *Id.* ¶ 54 (quoting TLA, App. A); *accord id.* ¶ 57 ("Thus, iBio's ownership rights in 'the Technology and Improvements, including the Intellectual Property Rights relating thereto' are comprehensive, and encompass all conceivable proprietary rights developed by Fraunhofer 'in the area of plant-based manufacturing technologies, techniques and methodologies and associated improvements.'" (quoting TLA § 8.1, App. A)).

[165]    Def.'s Answering Br. 6-7

[166]    *See supra* text accompanying note 34.

51

unpatented aspects of the technology such as extensive confidential know-how."[167] The words "include" and "such as" indicate that "know-how" is demonstrative rather than exhaustive, and other allegations in the Complaint confirm the broad scope of iBio's claims.[168]

In addition, in its Responses to Fraunhofer's First Set of Interrogatories, iBio does not, as Fraunhofer claims, "confirm that its claims are not based on proprietary rights under patent, copyright, trademark, and design patent or industrial design law."[169] Rather, iBio's Responses merely confirm that its *claims* are for breach of contract rather than for misappropriation of trade secrets.[170] In so confirming, iBio expressly stated that its "claims include all technology, including all know how, confidential and trade secret information, without need for differentiation."[171] Such statements are consistent with iBio's response to the Threshold Question.

---

[167] Compl. ¶ 9.

[168] *See, e.g.*, *id.* ¶ 57 ("iBio's ownership rights . . . encompass all conceivable proprietary rights developed by Fraunhofer . . . .").

[169] Def.'s Answering Br. 6.

[170] *Id.*, Ex. 2 at 10-11 ("The Verified Amended Complaint has not set forth a claim for misappropriation of trade secrets under the Delaware statute . . . although iBio reserves the right to bring a claim that Fraunhofer has improperly used for, or disclosed to, third parties information of iBio that qualifies as trade secrets. . . . iBio's claims are based in contract.").

[171] *Id.* at 11.

Third, Fraunhofer cites to certain of the Complaint's allegations regarding the technology that Fraunhofer developed for iBio to support its contention that iBio's claims are limited to "launch vectors" or "non-genetically modified plants." For example, the Complaint states that "iBio's technology uses 'launch vectors'—the vehicles for transporting DNA from one cell to another—to rapidly engineer and produce high levels of target proteins in non-genetically-modified plants."[172] I reject the notion that such background descriptions of the parties' development work constitutes a binding limitation on iBio's claimed technology. Nothing in the wording of those allegations indicates that iBio voluntarily and knowingly conceded[173] that its claims were limited to "launch vectors" or "non-genetically modified plants," especially in the presence of iBio's other allegations asserting ownership over a broad range of intellectual property rights.[174]

### F. iBio's Ownership Rights Only Extend to Technology Developed Through December 31, 2014

Fraunhofer's final argument is that its "obligation to develop technology for iBio and transfer technology to iBio ended on December 31, 2014."[175] I agree.

---

[172] Compl. ¶ 5.

[173] *Merritt*, 956 A.2d at 1201-02.

[174] Compl. ¶ 57.

[175] Def.'s Answering Br. 29.

53

Section 2 of the Fourth Amendment extends the TTA through December 31, 2014, requiring Fraunhofer to continue to develop and transfer to iBio the relevant technology.[176] Moreover, the Complaint confirms that iBio only seeks a declaratory judgment regarding its ownership rights over the technology that Fraunhofer developed through that date.[177]

iBio argues, in its reply brief, that it is entitled to all Improvements, "regardless of when made," and that any Improvements "must be included in Fraunhofer's technology transfer to iBio."[178] Yet, that position is contradicted directly by Section 2 of the Fourth Amendment, which only obligates Fraunhofer to "facilitate technology transfer and implementation by or for [iBio]" through December 31, 2014.[179] As such, iBio fails to point to any contractual provisions that prohibit Fraunhofer from developing additional Improvements or require it to transfer any such Improvements to iBio.

---

[176] Fourth Amendment § 2.

[177] Compl. ¶ 97 ("iBio is entitled to a declaratory judgment that: (i) iBio is the exclusive owner of all right, title, and interest in and to all technology developed by Fraunhofer through *December 31, 2014 . . . .*" (emphasis added)).

[178] Pl.'s Reply Br. 19.

[179] Fourth Amendment § 2.

54

## III.    CONCLUSION

For the foregoing reasons, I answer the Threshold Question in iBio's favor, except to the extent that iBio contends that it is entitled to Improvements made beyond December 31, 2014.

**IT IS SO ORDERED.**