HOB TEA ROOM, INC., a corporation of the State of Delaware, and HENRY P. BURROWS, JR.,
Defendants-below, Appellants,

*vs.*

MARY M. MILLER,
Plaintiff-below, Appellee.

MARY M. MILLER,
Plaintiff-below, Appellant,

*vs.*

HOB TEA ROOM, INC., a corporation of the State of Delaware, and HENRY P. BURROWS, JR.,
Defendants-below, Appellees.

*Supreme Court, On Appeal, June 26, 1952.*

TUNNELL, Justice, RICHARDS, President Judge, and HERR-MANN, Judge, sitting.

*William E. Taylor, Jr.*, for plaintiff below.

*Edwin D. Steel, Jr.*, and *William S. Megonigal, Jr.*, of the firm of Morris, Steel, Nichols & Arsht, for defendants below.

TUNNELL, Justice, delivering the opinion of the court:

On the fifth day of October, 1945, Mary M. Miller, the plaintiff, sold to Henry P. Burrows, Jr., one of the defendants, all of the capital stock of a Delaware corporation, Hob Tea Room, Inc. (hereinafter called "Hob"), the other defendant. The terms of the transaction were set out in a formal written instrument duly executed by plaintiff, by defendant Burrows, and by an escrow agent who is not involved in this litigation.

The general body of the contract caused no difficulty, but problems of some complexity have been raised as to this one paragraph thereof:

"Tenth. Buyer agrees that all receipts, including refundments *(sic)* of taxes, from any source whatsoever due said corporation at the date of this agreement, shall be paid over to Seller, with adjustment for any increased taxes to the corporation incurred by the receipt thereof."

Hob had been operated at a loss over that portion of the year 1945 beginning with January 1st and running up to October 5th, and thus, under the applicable provisions of the Internal Revenue Code then in force, the situation on the date of the contract was such that if the loss so far accrued to Hob in 1945 should not be erased by profits between October 5th and December 31st, then Hob would become entitled to refunds of portions of the excess profits taxes it had paid in respect to the years 1943 and 1944. It developed that there was in fact such a loss over the entire year 1945, and claims for the appropriate refunds were filed by Hob in May of 1946.

In due course, on the 24th day of November, 1947, a representative of the Bureau of Internal Revenue advised Hob that its claims for refunds would be "recommended for payment". Plaintiff knew that the refunds were a potential source of income to someone but did not keep herself advised as to the progress of the claims, and neither Burrows nor anybody else notified her that the claims had been so recommended for payment. Eventually, during June,

1948, Hob received checks from the Treasury Department representing total carry-back refunds in the sum of $10,047.52 by reason of Hob's net loss during the entire year 1945. Sometime later plaintiff learned of their payment to Hob. After adjusting the figure on her own initiative so as to relate it to that portion of the year which had elapsed prior to the sale of the stock on October 5th, and also in conformity with the formula provided in the tenth paragraph of the contract of sale, plaintiff claims that the amount to be "paid over" to her under the terms of the 1945 contract[1] total $8,326.63, with lawful interest thereon from June 3, 1948.

In the month of December, 1947, however, defendant Burrows proposed to plaintiff that he be permitted to discharge his obligation by making a lump sum settlement in lieu of the series of installments specified in the contract. There were no oral negotiations looking toward this plan, and the writings were entirely in the form of correspondence.

At the time Burrows broached to plaintiff his proposal for a single payment settlement, he also asserted against her several claims: (1), alleged failure to have on hand at the Hob restaurant premises at the time of the sale an ice cream cabinet, which he valued at $300, and a cash register valued at $600, (2), a claim for reimbursement for $78.69 in Federal Unemployment Tax, and (3), accrued interest in respect to the above two claims in the sum of $109.43.

In due course, after three letters, which we shall later be required to consider in further detail, an accelerated plan of payment or final settlement (depending upon the point of view) was adopted. The release which Burrows took from Mrs. Miller on the 31st day of December, 1947, at the conclusion of these negotiations, was drawn by her attorney, and its language was in part as follows:

"* * *

"Whereas under the terms of the said agreement there is now due as of the Thirty-first day of December, A. D. 1947, on the principal $20,534.72 with

---

[1] There was another tax refund which is not involved here because it was undisputed. On the date of the contract Hob's books showed an asset called "the excess profits tax post-war refund credit" due it in the sum of $716.51. That item was duly turned over to plaintiff.

interest at 5% from January 1, 1947 to December 31, 1947, in the sum of $1,026.73 making a total amount of principal and interest due under the said contract of $21,561.45.

"Whereas an offer in full settlement and satisfaction of the said total amount due on the said contract has been made as of this date by the Buyer of $20,561.45, being One Thousand Dollars ($1,000.00) less than the balance of principal and interest due under the said contract which offer has been accepted by the Seller.

"Now This Indenture Witnesseth: For and in consideration of the sum of Twenty Thousand Five Hundred Sixty-One Dollars And Forty-Five Cents ($20,561.45), paid by the Buyer to the Seller, the receipt of which is hereby acknowledged as payment in full settlement and satisfaction under the above mentioned contract, thus terminating and ending the said agreement, the said Seller hereby instructs the said escrow agent to deliver and release forever unto the said Buyer the said Judgment Bond executed by the Buyer to the Seller in the sum of Twenty-five Thousand Dollars ($25,000.00) the said Judgment Bond executed by the said Hob Tea Room, Inc. to the Seller in the sum of Twenty-five Thousand Dollars ($25,000.00) and the One Hundred (100) shares of capital stock of Hob Tea Room, Inc., represented by two (2) certificates, one for forty-nine (49) shares and one for fifty-one (51) shares registered in the name of the Buyer, receipt of which is hereby acknowledged by the Buyer.

"And the said Buyer and Seller hereby forever release the said Escrow Agent from any further claim hereof pertaining to this agreement.

"The Buyer and the Seller hereby agree to forever release and discharge each other, their Heirs, Executors, Administrators and Assigns from any further claim or demand whatsoever pertaining to the above recited agreement bearing date the Fifth day of October, A. D. 1945.

"In Witness Whereof, * * *."

Upon these facts plaintiff first contends that the tenth paragraph of the 1945 contract, as written, required defendants to surrender the tax refunds above described to plaintiff. She argues that these monies were "due" on the date of the contract, provided that the word "due" is understood as it ought to be in the light of the circumstances which had surrounded the execution of the contract. That is the theory upon which the original complaint filed in the cause was designed. Upon a change of counsel for the plaintiff, however, this original theory was abandoned, and an amended complaint was filed seeking relief on the theory that although the contract as drawn did not provide that plaintiff should receive the

refunds, the oral agreement which had led up to the drafting of the contract had so provided, and since the written contract thus failed accurately to describe the ground upon which the minds of the contracting parties had met, the contract should, therefore, be reformed to correspond with the actual agreement.

The case was tried upon this last-mentioned theory, and throughout the trial defendants made objections and consistently confined the scope of the trial, so far as they were able, to the reformation theory set out in the amended complaint.

Some three months after the trial, but before a decision had been rendered in respect to it, plaintiff requested leave again to amend, seeking to pick up for a second time the theory of the original complaint that the contract, as written, would entitle the plaintiff to relief. Since the plaintiff had once adopted this theory, then "consciously" abandoned it, and subsequently had tried the case upon her second theory, and since counsel for defendants at the trial had not expressly or by implication consented[2] to enlargement of the issues as set out in the amended pleadings, the Chancellor declined to permit the amendment at that late stage.

The plaintiff, therefore, has appealed to this court upon two grounds, first, that the court erred in not finding that the contract of 1945 should be reformed, and secondly, that the trial court abused its discretion under the circumstances in declining to permit the above-mentioned amendment.

Then there is an issue in the case concerning the 1947 release. Defendants contended in the Court of Chancery that this release is a bar to the entire action. Plaintiff, on the other hand, contended that a fair interpretation of the language of the release, in the light of all attending circumstances, does not even touch upon the question of tax refunds and, therefore, does not bar the action.

The Chancellor, however, found that the 1947 release, as drawn, did bar plaintiff's action. The theory that there was ground for reformation of the release was not advanced in the first instance by plaintiff, but by the Chancellor, *sua sponte*, in his letter opinion

---

[2] Which, under *Chancery Rule* 15(b), would have changed the ruling in respect to the amendment.

of the 21st day of June, 1950. In due course the plaintiff amended her complaint to pray for the reformation which the Chancellor had indicated he would order. After some involved procedural maneuvers which it is not necessary for us to describe,[3] reformation of the 1947 release was ordered. From that portion of the judgment ordering reformation of the release the defendants have appealed.

The lower court considering this question of the 1947 release in advance of all other issues in the case, because if it should be decided in favor of the defendants, the entire controversy would be settled at a single stroke. The same reason induces us to do likewise.

In order that we may approach the problem of this 1947 release in proper perspective, it seems desirable at the outset to note certain rules of law which govern us under the facts of this controversy.

■ First of all, we must bear in mind that we are to consider the execution of the release as a transaction in good faith. The Chancellor, in his opinion of the 21st day of June, 1950, found no basis for the charge of fraud, and in his opinion of November 8, 1951, he said that "no question of fraud is raised by the evidence". No appeal has been taken from these findings.

■ We have a record before us containing both oral and documentary evidence. Therefore, we must remember to accord very great weight to the findings of fact of the Court of Chancery wherever they are based upon oral testimony of witnesses who were personally heard by the lower court, for as to that type of evidence the trial court was in a better position to judge the facts than we are. By the same token, however, wherever the findings are based upon documentary evidence, which we can study with the same facility as the trial court, we are not per-

---

[3] The record contains 61 docket entries, including four opinions and stay of a suit in the Superior Court. The statement of facts prefacing this opinion, however, omits all matters except such as might be thought to have some possible bearing upon these appeals. For some further detail as to facts, reference may be had to the two opinions of the Chancellor which were reported. They appear in 31 *Del.Ch.* 404, 75 *A.2d* 577, and *Del.Ch.* 32 84 *A.2d* 170.

mitted to treat these findings with the same degree of deference. *New York Trust Co. v. Riley,* 24 *Del.Ch.* 354, 378, 16 *A.2d* 772, 783, as modified by *Blish v. Thompson Automatic Arms Corp.,* 30 *Del.Ch.* 538, 64 *A.2d* 581, 604.

■ Finally, there is no rule of law under the circumstances here present requiring or allowing any special indulgence to be shown either of these parties. Mr. Burrows at the time of executing the 1947 release was approximately thirty years of age; he was a man accustomed to operating a business; and he acted on the advice of counsel. Mrs. Miller, on the other hand, was a lady of mature years and had had at least some business experience. In this matter she obtained the advice of her husband, as well as the assistance and advice of an accountant, a financial consultant, and an attorney.

As we now grapple with the merits of the case, we must begin by ascertaining what evidence there is in the record to support the finding of the Court of Chancery that the broad language of the release, porporting to absolve both parties from any further liability of any nature touching the contract, is such a departure from the actual agreement between the parties as will entitle plaintiff to have it reformed.

There is the testimony of plaintiff that she did not understand the release to refer to anything except the reduction of a time price to a cash settlement price, and, specifically, that she did not realize that the release referred in any way to the tax refunds. We accept these statements as facts, because the Chancellor, who heard her testify, believed her and found accordingly. For the same reason we accept as fact, in so far as it may have importance, the testimony of Mr. Burrows that he did not specifically think of the tax refunds in connection with the release at all, because he believed them to belong to Hob anyhow, without question, and it never occurred to him that any release was needed to obtain them.

In his letter of December 8, 1947, the first of the three letters which comprise the entire course of negotiations leading up to execution of the release, Mr. Burrows had asserted the several above-mentioned claims against plaintiff, had in detail proceeded

to outline his plan for immediate full payment, and had then argued for it in these words:

"For you, this would mean the immediate cash, and no future concern about the operations, claims and obligations of Hob Tea Room, Inc., or about my credit. * * * However, I should like to have some idea * * * as to what amount, if any, you might consider worthwhile for a full release to me from the terms of the contract."

In the second letter of Mr. Burrows, dated December 23rd, 1947, he offered twenty thousand dollars "in exchange for a final settlement of the terms of the contract of sale."

The Chancellor found that the "emphasis" in the entire transaction was upon reduction of the purchase price. By this he may possibly have had in mind the recitals of the release.

From the above-mentioned oral testimony of plaintiff and defendant Burrows, from the letters, and from the recitals of the contract, the Chancellor concluded, (1), that the release of 1947 was intended to relate to nothing except the single matter of a reduction in the installment payments by reason of their acceleration, and (2), that since neither plaintiff nor Burrows, although for different reasons, was thinking of the tax refunds at all, it follows that the release in any case could not have been intended to extinguish plaintiff's rights, if any she had, to these refunds.

We have difficulty with both of these conclusions. In the first of the letters of Mr. Burrows proposing an accelerated payment, and in plaintiff's reply, more space was devoted to the claims against her for the ice cream cabinet, the cash register, and the unemployment tax than to the question of accelerated payment. In the face of this documentary evidence, uninsulated from execution of the release by any oral discussion, we cannot escape the conclusion that the mutual release provisions embodied in the release by plaintiff's counsel were certainly intended to benefit plaintiff by covering at least a settlement of these specific claims, in addition to the expressly named item of accelerated payment. While these claims themselves, of course, are not here important for their own sake, they do force us from the Chancellor's position that the release referred exclusively to one subject.

As to the recitals in the release, although they admittedly emphasize only one feature of the agreement, we are not able, after close study, to find in them any incompatibility with the plain language of the general mutual acquittance set out in the body of the instrument. In any case, as we shall indicate below, in our view of the matter the burden upon plaintiff is more specific and more onerous than the establishment of a mere "emphasis" in her favor.

■ Then we have difficulty with the Chancellor's second conclusion, that because neither party had tax refunds expressly in mind when the release was executed, therefore, as a proposition of logic, it follows that the release could not have been intended to relate to them. This reasoning overlooks the concept of a general release, one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind, but what may, nevertheless, arise. Such general releases are in common use, and their potency, if it renders them too dangerous for careless handling, is at the same time a constant boon to businesses and courts. Their validity is unchallenged.

In the early Massachusetts case of *Hyde v. Baldwin*, 17 *Pick.* 303, 307, the Supreme Judicial Court said:

"In order that a release of all demands should operate as a release of a particular demand or interest, it is not necessary that that particular demand should have been in the mind of the parties at the time of its execution. It shall be held to embrace all demands embraced by its terms, whether particularly contemplated or not."

See also *Houston v. Trower*, (8 *Cir.*), 1924, 297 *F.* 558, and the numerous authorities therein cited.

■ The release under consideration provides for a general and final settlement of all matters touching the 1945 contract. Its language is unmistakably lucid. The presumption is that the parties executing such a formal agreement intended what they said.

■ The clear language of a formal instrument, duly executed, may not be lightly set aside. The commonest cases in which it will be set aside are where one of the parties has unfairly procured its execution. But it will be set aside also where the evidence leaves

no serious doubt but that a specific agreement was informally made, but that somehow in articulating that understanding, through the honest mistake of both parties, the formal terms failed in some material respect to conform to the agreement. Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand. *Colvocoresses v. W. S. Wasserman Co.*, 26 *Del.Ch.* 333, 28 *A.2d* 588; *Restatement of Contracts, Sec.* 504, *Comment "b"; Miller v. Hob Tea Room*, 31 *Del.Ch.* 404, 75 *A.2d* 577, 580.

The basic difficulty we have with the Chancellor's conclusion is that it appears to view the scope of a general release as being limited to the sum of all the individual items which the parties specifically and affirmatively intended to include within it. We, on the other hand, consider a release to derive generality from a mere contract to make it general.

■■ The burden the plaintiff assumed and carried at the trial was to prove, first, that neither party had the tax refunds specifically in mind when the release was executed, and secondly, that she herself for some cause did not take the release to refer to any subject except a reduction in the amount of the scheduled payments. As we view it, however, it was the plaintiff's burden to prove, by evidence "in every respect clear and convincing, and free from doubt," that the actual agreement of the parties was that the release should not be the general one it purports to be. *Colvocoresses v. W. S. Wasserman Co.*, 24 *Del.Ch.* 53, 60, 4 *A.2d* 800, 803. This burden she did not sustain. So far as we know, or have any right to assume on this record, Mr. Burrows intended by this lump sum payment to do what the release says both parties intended, to end all obligations between the parties having anything to do with the contract. Since there was no proof whatever that Burrows intended to deal for anything less than a termination of all rights under the contract, we are unable to find in the facts the basis for a conclusion of "mutual" mistake. That Burrows did not have the tax refunds specifically in mind is not in any way inconsistent with the theory that he, nevertheless, intended a complete and final settlement. All we know is that the plaintiff made

a mistake. But in a good faith transaction her mistake alone constitutes no basis for reformation. *Home Life Insurance Co. v. McCarns*, 25 *Del.Ch.* 220, 224, 16 *A.2d* 587.

In summary, we find no evidence in the record of any understanding of any kind between the parties that the subject of tax refunds was to be excluded from the coverage of the 1947 release. The Chancellor found that there was no such, and we agree with his conclusion. Further, there was absolutely no agreement, express or implied, that the release was not to be the general one it purports to be. Since we have here no other agreement to which we can refer as a source of information more reliable than the formal instrument executed by the parties, the only conclusion open to us is that the 1947 release must be read as it was written.

Because we have found that the release settled all claims which either party could raise against the other concerning the entire transaction, the questions as to which the plaintiff appealed have become moot.

The judgment of the Court of Chancery will be reversed and the cause remanded for entry of a new judgment in conformity with this opinion.