# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARI GREENBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0388-BWD |
| | ) | |
| RATEGAIN ADARA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: November 3, 2025
Date Decided: January 12, 2026

Jamie L. Brown and Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; OF COUNSEL: Jordan A. Finfer and Elizabeth L. Archerd, PATZIK, FRANK & SAMOTNY LTD, Chicago, IL; *Attorneys for Plaintiff Ari Greenberg*.

Travis S. Hunter and Gabriela Z. Monasterio, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; OF COUNSEL: Jeffrey J. Mayer and Catherine A. Miller, AKERMAN LLP, Chicago, IL; *Attorneys for Defendant RateGain Adara, Inc.*

**DAVID, V.C.**

The plaintiff and his brother sold their social media marketing company to the defendant in 2019. As part of that sale, the plaintiff signed a letter agreement governing his continued employment with the acquired entity, under which he received stock options that would vest so long as he remained with the company on the one-year anniversary of his employment. But the agreement separately permitted the buyer to terminate the plaintiff for "non-performance" on a date sooner than the one-year anniversary of his employment if the acquired company did not achieve certain financial targets. The company failed to meet those targets, the buyer terminated the plaintiff's employment, and the plaintiff's options did not vest.

The plaintiff now seeks to reform his employment agreement on grounds of mutual or unilateral mistake. He contends that the parties reached a prior understanding that his options would be "guaranteed" and did not mean to permit the buyer to terminate him before his options could vest. In this post-trial memorandum opinion, I find that the plaintiff has failed to establish a right to reformation by clear and convincing evidence. Judgment is entered for the defendant.

1

## I.    BACKGROUND

The following facts are as the Court finds them following a three-day trial held on July 1, 2, and 15, 2025.[1]

### A.    BCV And RateGain Negotiate A Merger.

In 2009, Ari Greenberg ("Plaintiff" or "Ari") and his brother, nonparty Benji Greenberg ("Benji"),[2] founded BCV Social, LLC ("BCV"),[3] a Delaware limited liability company that provides social media marketing in the hospitality industry.[4] Benji served as BCV's Chief Executive Officer ("CEO") and Ari served as President.[5]

After operating for a decade, BCV sought to expand its business internationally.[6]  Among other options, BCV considered identifying a strategic merger partner that could help realize its vision.[7]  BCV engaged financial and legal

---

[1] Citations to "PTO ¶ __" refer to stipulations in Section III of the Stipulation and Pre-Trial Order.  Dkt. 128.  Trial testimony is cited as "Tr. (Witness) at __".  Dkts. 136–38.  Joint exhibits are cited as "JX __".  Dkt. 129.

[2] This memorandum opinion refers to Ari Greenberg and Benji Greenberg by first name in the interest of clarity; no disrespect or familiarity is intended.

[3] On April 1, 2025, BCV merged with Adara Inc., a wholly owned subsidiary of RateGain, with RateGain Adara Inc. as the surviving entity.  PTO ¶ 2.  To avoid confusion, this memorandum opinion refers to RateGain Adara Inc. as "BCV" or "Defendant."

[4] PTO ¶¶ 1–2, 4; Tr. (Benji) at 7:22–8:3.

[5] PTO ¶¶ 1, 4; Tr. (Benji) at 15:7–8.

[6] Tr. (Benji) at 15:21–16:3.

[7] *Id.*

advisors at City Capital Advisors ("City Cap") and Katten Muchin Rosenman LLP ("Katten"), respectively, to advise on potential alternatives.[8]

While BCV was exploring strategic alternatives, Ari attended a conference where he met Bhanu Chopra,[9] the founder, Chairman, and Managing Director of RateGain Travel Technologies Pvt Ltd ("RateGain"), a limited entity organized under the laws of India that provides "software-as-a-service solutions" in the hospitality and travel industries.[10] Thereafter, BCV met with RateGain's leadership team, including Chopra and RateGain's Chief Financial Officer, Tanmay Das, to discuss a potential transaction between BCV and RateGain.[11]

On March 27, 2019, BCV and RateGain executed a letter of intent under which RateGain proposed to acquire BCV in a cash merger (the "Merger").[12] RateGain proposed a closing date of May 31, 2019.[13]

---

[8] *Id.* at 18:14–19:8; PTO ¶¶ 7–13.

[9] Tr. (Benji) at 16:8–18.

[10] PTO ¶¶ 3, 6; JX 73 at 5–6.

[11] Tr. (Benji) at 17:6–18:3.

[12] *Id.* at 19:19–20:3, 22:24–23:4; PTO ¶ 16.

[13] JX 2 at 1.

**B.** **Ari And Benji Negotiate Their Continued Employment With RateGain.**

Benji and Ari understood that because BCV was not yet profitable, RateGain would not make a large upfront payment in the Merger.[14] Instead, most of Benji's and Ari's compensation would have to come through an earnout structure under which they would receive cash payments if the company achieved financial goals after closing.[15] To sweeten the deal, Benji and Ari pressed for employment agreements under which they would continue to earn competitive salaries and receive equity in the surviving company.[16]

The parties agreed that they would negotiate the terms of Benji's employment before turning to Ari's.[17] From RateGain's perspective, Benji's agreement to continue running BCV as its CEO for some period after closing was essential to the deal;[18] Ari's participation, while helpful, was not necessary to get the deal done.[19]

---

[14] Tr. (Benji) at 21:18–22:23; *see id.* at 103:1–7.

[15] *Id.* at 22:4–8.

[16] *Id.* at 22:9–23; *id.* (Ari) at 193:17–194:14.

[17] JX 12 at 1 ("I told [Das] that he should focus on getting the definitive agreement and Benji's agreement done before coming back to me. Those are still the priorities . . . .").

[18] Tr. (Das) at 378:18–379:3 ("Q. Would the deal have gone through if Benji had decided not to work for BCV post merger? A. No. Q. Why is that? A. Because we did not . . . have the know-how to run the company, and we needed a CEO to run the company. And Benji was the right person.").

[19] *Id.* at 378:12–17 ("[T]he deal would have gone through with or without Ari."); *id.* (Chopra) at 543:14–17 ("Q. If Ari had decided not to join the post-merger BCV, would RateGain still have proceeded with its acquisition of BCV? A. Yes, we would have.").

4

On May 3, RateGain sent City Cap a thirteen-page draft employment agreement for Benji, contemplating that Benji would continue to serve as BCV's CEO, earning an initial annual base salary of $150,000.[20] The draft provided that Benji would participate in incentive plans and could earn bonuses based on annual performance targets.[21] RateGain's draft contemplated that Benji's employment would expire in one year and that prior to that date, Benji could be terminated only for cause or incapacity.[22] The draft proposed a four-month severance period and did not include an equity award.[23]

On May 9, David Modiano of City Cap sent RateGain a counterproposal for Benji's employment agreement.[24] City Cap left Benji's salary blank with a note for "RateGain to propose entire compensation package so that [Benji] can evaluate it in its entirety."[25] The draft proposed extending the term of Benji's employment by two additional years, through March 31, 2022, and it proposed increasing the period under which Benji could receive severance from four to twelve months.[26] In

---

[20] JX 4 at 1, 3.

[21] *Id.* at 3.

[22] *Id.* at 4.

[23] *Id.*

[24] JX 5 at 1. Along with Modiano, City Cap Managing Director Scott Lang negotiated the Merger and employment agreements on behalf of BCV, Benji, and Ari. PTO ¶¶ 11–13.

[25] *Id.* at 3.

[26] *Id.* at 4–5.

addition, the draft directed "RateGain to propose stock option or other equity incentive package."[27]

That evening, Das, Benji, and Ari met for dinner,[28] and the next day, Das met with Benji, Modiano, and Lang at City Cap's Chicago office to continue negotiating Benji's compensation.[29]

On May 17, RateGain made another counterproposal for Benji's employment agreement, flagging a "[f]ew contentious points where [the parties] need[ed] to arrive at a middle ground[.]"[30] RateGain proposed "start[ing] with a[n] Annual Base of $175,000 and . . . increas[ing] [it] to $200,000" on April 1, 2020, contingent on achieving financial targets.[31] RateGain agreed to extend the term of Benji's employment through March 31, 2022, with "no termination without cause as long as below par performance can be defined a[s] cause."[32] RateGain's draft counter-proposed that Benji would receive severance for six instead of twelve months.[33]

---

[27] *Id.* at 4.

[28] JX 6 at 1.

[29] *Id.*

[30] JX 8 at 1.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 6.

RateGain also responded to Benji's request for an equity proposal by offering Benji 1,000 options to purchase RateGain stock at a discounted strike price, which, consistent with Indian law,[34] would not vest until the one-year anniversary of Benji's employment.[35] This memorandum opinion refers to this concept as a "First Employment-Based Tranche" of options—in other words, a tranche of options granted immediately and continent only on Benji remaining employed by BCV on the vesting date. RateGain further offered to grant Benji "another 1000 options on April 2020," the anticipated one-year anniversary of his employment, contingent on achieving EBITDA milestones.[36] This memorandum opinion refers to that second set of options as a "Second Performance-Based Tranche" of options.

Three days later, on May 20, Katten attorney Diane Bell circulated a revised draft of Benji's employment agreement to Benji and his other advisors.[37] Katten's draft proposed accepting RateGain's salary proposal.[38] In addition, consistent with

---

[34] Indian law requires a minimum period of one year between the granting and vesting of options. JX 14 at 1 ("[The options] will vest in 1 year, there is a mandatory vesting period defined by the Companies Act, hence irrespective [of] any reason [they] will not vest before 1 year."); *see* Companies (Share Capital and Debentures) Rules, 2014, Rule 12(6)(a) (India) ("There shall be a minimum period of one year between the grant of options and vesting of option.").

[35] JX 8 at 5.

[36] *Id.*

[37] JX 9 at 1.

[38] *Id.* at 22.

RateGain's proposal, Katten's draft added a provision stating that BCV could terminate Benji for "Nonperformance" after May 1, 2020, if BCV failed to achieve EBITDA targets:

> [T]he Employment Period may be terminated (A) by the Company (1) at any time prior to such date for Cause (as defined below), (2) for Nonperformance, or (3) following the expiry of the Initial Term, without Cause or for Nonperformance or (B) by [Benji] at any time prior to such date with Good Reason or without Good Reason. . . .
>
> For purposes of this Agreement "Nonperformance" shall mean at any time following May 1, 2020 the Company's EBITDA is less than 75% of the EBITDA set forth in the Plan for such 3-month period (the first of such periods ending July 31 2020).[39]

Katten's draft held firm on severance, again proposing that Benji could receive severance for twelve months.[40]  As for equity, the draft stated:

> [Additionally on or around the date hereof the Company shall cause [applicable RateGain entity] to issue options to purchase 1,000 shares of [applicable RateGain entity] with a strike price of $14.00 per share in each case that that will fully vest upon the earlier of (i) one year from the date hereof or (ii) termination by [Benji] for Good Reason in form and substance reasonably acceptable to [Benji],][Subject to review of equity documentation].[41]

With minor changes, City Cap sent Katten's revised proposal to RateGain on May 22.[42]

---

[39] *Id.* at 24, 26.

[40] *Id.* at 24.

[41] *Id.* at 23–24 (brackets in original).

[42] JX 11 at 1.

Nearly a month into the negotiation of Benji's employment agreement, on May 27, Ari emailed Chopra requesting that the parties "find time to connect to talk through [Ari's] role/fit at [RateGain]."[43]  Ari noted that while Benji's employment agreement was still the "priorit[y]," it was "getting to be a late hour" and Ari "also want[ed] to make sure [he] ha[d] a deal in place prior to close."[44]  Two days later, on May 29, City Cap emailed Das a list of outstanding items to be completed prior to closing, which included finalizing both Benji's and Ari's employment agreements.  City Cap explained that:

> Right now the biggest gating item from our view is receipt of your comments on the Employment Agreements and we cannot move forward without alignment on this.  Please send this to us today, if at all possible.  To date we have been focused on Benji's employment agreement, however given we are hopefully a week away from closing, we suggest sending over Ari's employment agreement as well.[45]

The next day, May 30, Das sent Modiano and Lang an email offering "broad" comments on the latest draft of Benji's employment agreement, as well as proposed terms for Ari's employment agreement.[46]  Das proposed that both Benji and Ari would receive "1000 Options each" that would "vest in 1 year," consistent with

---

[43] JX 12 at 1.

[44] *Id.*

[45] JX 13 at 1.

[46] JX 14 at 1–2.

Indian law.[47] Das proposed that Benji would receive severance but Ari would not.[48] Das also noted that the duration of Ari's employment, unlike Benji's, would not have a "lock-in" period.[49]

Later that day, Katten internally circulated a revised draft of Benji's employment agreement that incorporated the comments in Das's May 30 email.[50] The draft increased Benji's initial annual base salary to $250,000.[51] The term of Benji's employment remained the same, and the draft continued to provide that Benji could be terminated for cause or "Nonperformance,"[52] but modified the definition of "Nonperformance" to mean

> at any time following ~~May 1, 2020,~~April 2020 the Company's EBITDA is less than ~~75~~(i) [70]% of the EBITDA set forth in the <u>First Year</u> Plan for <u>the</u> 3-month period ~~(the first of such periods~~ ending ~~July 31, 2020)~~March 30, 2020 or (ii) [80]% of the EBITDA for any fiscal quarter set forth in the Plan for a period thereafter.[53]

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] JX 15.

[51] *Id.* at 3.

[52] *Id.* at 4–5.

[53] *Id.* at 6.

The draft reverted back to a six-month severance period.[54]  It also stated that Benji would receive "options to purchase 2,000 shares of RateGain . . . with a strike price of INR 833 per share,"[55] with a First Employment-Based Tranche of 1,000 options to "fully vest one year from the date hereof" and a Second Performance-Based Tranche of 1,000 options to "fully vest one year from the date hereof if and only if [an] EB[IT]DA Threshold is met."[56]

C. **Katten Proposes A Revision To Benji's Draft Employment Agreement To Ensure His Options Will Vest.**

By May 31, 2019, the Merger still had not closed.  That day, Katten and Benji discussed that the latest draft of Benji's employment agreement permitted RateGain to terminate Benji for Nonperformance on April 1, 2020, which would occur before the one-year anniversary of his employment (and the day his options would vest).[57] To address that possibility, Katten prepared another draft employment agreement revising the definition of "Nonperformance" as follows:

> at any time following ~~April~~June [ ], 2020[FN] the Company's EBITDA is less than (i) [70]% of the EBITDA set forth in the First Year Plan for the 3-month period ending March 30, 2020 or (ii) [80]% of the EBITDA for any fiscal quarter set forth in the Plan for a period thereafter.[58]

---

[54] *Id.* at 5.

[55] *Id.* at 4.

[56] *Id.*

[57] JX 17 at 1 ("Non-Performance Termination can occur at April 1, 2020.").

[58] JX 16 at 6.

**[FN]One year following the Closing.**[59]

Later that day, Modiano reported back to the team that Das had orally agreed to revise Benji's "termination date to June 2020" to ensure that Benji's options would vest before he could be terminated for Nonperformance.[60] For Ari, Modiano reported that Das

> Agreed to same equity as Benji - equity vests fully even if a new role is not agreed upon, but assuming I do complete the initial objective in the 3-6 month period - NEEDS TO VEST OVER 1 YEAR PERIOD DUE TO INDIA LAWS, WILLING TO FIND A WORK AROUND TO GIVE ARI OPTIONS EVEN IF HE DOESN'T CONTINUE.[61]

Modiano also noted that "[w]e owe [Das] a draft of Ari's employment agreement (or offer letter)."[62]

### D.    The Parties Negotiate Ari's Offer Letter.

Katten then turned to drafting Ari's employment agreement. Rather than using Benji's agreement as a template, Katten suggested preparing a shorter form "offer letter," and Ari agreed.[63] On June 1, Bell sent Ari a draft offer letter (the

---

[59] *Id.* at 6 n.2; *see also* JX 17 at 1 (Benji noting that "I [c]an be [t]erminated [p]rior to the Initial Option Grant Vesting . . . . Worth pushing back on initial termination date for non-performance").

[60] JX 18 at 1.

[61] *Id.*, *but see* Tr. (Das) at 381:6 ("This is not my language."); *id.* at 381:4–382:16 ("We agreed to grant him 1000 options, but not guaranteed vesting.").

[62] JX 18 at 2.

[63] JX 19 at 2.

"Offer Letter") for his review.[64] Katten's initial draft provided that Ari would serve as BCV's "Head of Global Growth," earn an initial annual base salary of $200,000, and receive vacation and travel benefits.[65] The draft contemplated that Ari could earn a $50,000 bonus upon the completion of a "superpod" project for BCV and an additional "EBITDA bonus" based on annual performance targets.[66]

Although RateGain purportedly had offered Ari the "same equity as Benji,"[67] Katten's initial draft Offer Letter did not include an award of stock options like in Benji's agreement.[68] Instead, apparently for tax reasons, the draft proposed an entirely different structure under which Ari would receive stock appreciation rights ("SARs") representing 2,000 shares of RateGain, which would vest based on performance targets in March 2020.[69] Ari responded with comments on the draft, including that he

> [w]ant[ed] to make sure we are operating as if I[']m leaving at the 6 month mark or earlier. So we should always be trying to ensure whatever bonus or equity is paid in full [regardless] of how long I stay. (If you believe we already fought that battle and lost - no problem, I

---

[64] *See id.*

[65] JX 20 at 5.

[66] *Id.*

[67] JX 18 at 1.

[68] JX 20.

[69] *Id.* at 5.

dont think we have yet, but there has been a lot of email and call traffic so not 100%).[70]

In response, Katten revised the draft Offer Letter again to state that Ari would receive an "EBITDA bonus" when such bonus was payable, and the SARs when they vested, "whether or not [Ari] [was] employed by the Company as of such time."[71] City Cap sent the draft Offer Letter to RateGain on June 3.[72]

The next day, however, Katten thought better of the SAR proposal, deciding it had been a "mistake."[73] At the same time, City Cap and Katten separately raised a concern that issuing options at a discount, as RateGain initially proposed, presented "significant 409A US tax issues."[74] After further consideration, RateGain agreed that the options could not be granted at a discount.[75] Katten began drafting another revised Offer Letter to address the tax issues.[76]

---

[70] *Id.* at 1.

[71] JX 21 at 3.

[72] *Id.* at 1.

[73] JX 26 at 1 ("[T]he only thing we absolutely needed a solution for was the Bonus element of the options and assuring that Ari would vest even if his employment would ordinarily terminate before 1 year.").

[74] JX 27 at 1.

[75] *Id.*

[76] *See* JX 31.

On June 5, Katten sent a revised draft to Das proposing changes to the termination, severance, and equity provisions in Ari's Offer Letter.[77] First, unlike Benji's employment agreement, Katten's new draft Offer Letter did not contemplate that RateGain could terminate Ari for "Nonperformance" after a certain date. Instead, it again proposed an entirely different structure—that if the company terminated Ari other than for cause, he would be entitled to "garden leave" with pay:

> Notwithstanding anything herein to the contrary if (i) the Company terminates your employment for any reason other than Cause (as defined below) prior to June __, 2020, (ii) you quit for Good Reason (as defined below) prior to June __, 2020 or iii) you and the Company fail to agree to a Permanent Position (as defined below) by the earlier of the Superpod Completion (as defined below) and October 15, 2020, you shall be relieved of all of your obligations (other than as set forth on **Exhibit C**) and authority as of such time but the Company shall continue to employ you and pay you your Base Salary as in effect as of such time until June __, 2020 (such period of time while you have no obligations (other than as set forth on **Exhibit C**) or duties to the Company, the "Leave Period").[78]

The revised draft also stated that Ari would receive severance if he was terminated without cause, despite RateGain previously rejecting that request.[79]

In addition, in response to the 409A tax concerns, Katten removed the SARs and instead proposed that Ari would receive "options to purchase 2,000 shares of

---

[77] JX 33 at 1.

[78] *Id.* at 19.

[79] *Id.* at 20.

RateGain."[80]   Unlike Benji's employment agreement, which contemplated 1,000 options in a First Employment-Based Tranche and another 1,000 options in a later Second Performance-Based Tranche, under Katten's revised draft Offer Letter, no component of Ari's 2,000 options would be performance-based.[81]

Katten also proposed to RateGain that Benji's and Ari's options would be granted at fair market value ("FMV"), and contemplated a separate bonus agreement (the "Special Bonus Agreement") under which Benji and Ari would receive the difference between the discounted price and FMV at a later date.[82]   When Katten attorney Matthew Brown sent the draft Offer Letter back to RateGain, he proposed that:

> RG will execute a separate Bonus agreement that will promise to pay Benji and Ari the difference between the offered $14 per share strike price and the final FMV when established. The bonus will only be payable at the earlier of a 409A qualifying change of control transaction and 5 years following closing.  This solution also has implication for Ari's Agreement, particularly because of the Indian requirement that options cannot vest until one year of service is completed. Consequently, to address this and your requirement that Ari have a non-compete, Ari's revised agreement now contains a garden leave that will require him to remain on payroll, although without duties or authority until his options are vested.  Similar to Benji, he will be entitled to 6 months of severance offset by any garden leave, and in return will have

---

[80] *Id.*

[81] *Id.*

[82] *Id.* at 1, 12, 20.

a twelve month non-compete terminating 6 months after the severance period is completed.[83]

Das responded that he had "not gone through this document" and asked for a phone call with Brown,[84] while reiterating that any agreement should provide for:

> -1000 option values.
> -Only payable at a Liquidity Event no 5 year concept.
> -There can not be a guaranteed/defined bonus amount as it will depend upon valuation of the company minus the strike price. Valuation may go up and down. Its equity value of a company not a fixed return.[85]

Separately, Das responded that:

> Just to clarify the additional 1000 options are contingent upon achievement of milestones in a slab structure. The strike price of those grants can not be determined now. The current discount is only for 1000 options. We can have mention of the additional shares in the employment agreement not in the stock option agreements and those are standard agreement we can not make any amendments to those apart from the strike price to be FMV.[86]

Brown countered, pushing for Benji and Ari to each receive all 2,000 options (including 1,000 Second Performance-Based Tranche options) granted immediately:

> 2,000 options are to be granted NOW in order to start one year vesting clock. 1,000 are solely time vested and 1,000 are performance vested. If they are not all granted now then the second 1,000 are illusory since another year of time vesting would be required. . . . The best we can

---

[83] *Id.* at 1 (formatting adjusted).

[84] JX 37 at 1.

[85] *Id.*

[86] JX 38 at 1.

do is pick a fixed number now. This is the number you used. If it is too small Benji and Ari will lose out.[87]

Brown continued to push RateGain, arguing that "[i]f you do not grant the second thousand option[s] now, they are illusory."[88] On June 5, Brown followed up with a proposed "Option Grant Agreement and Bonus Agreement" for Benji, proposing that Benji would receive a $236,000 Special Bonus.[89]

By this time, RateGain felt that Benji and Ari were over-asking and became frustrated by their proposals.[90] On June 6, Das told Brown that "it has been pretty frustrating for both sides, as these issues are hampering our timelines to close."[91] Das rejected the Special Bonus Agreement, and also informed Katten that RateGain's final offer was to grant 1,000 options in the First Employment-Based Tranche only:

> Unfortunately, the special bonus route is not approved by the board as it somewhat violates the spirit of an option scheme. When I offered the discounted scheme I was not aware of the 409A regulations and thanks to your team we right fully discovered that it is not the right method. According to us both Benji and Ari are already incentiv[iz]ed with a significant earning potential through the earnouts so this was an added bonus. Given the 409A situation, we understand we can't offer a deep

---

[87] JX 39 at 1.

[88] JX 40 at 1.

[89] JX 41 at 5–6, 18–19.

[90] JX 54 at 2 (Ari acknowledging that RateGain perceived Benji and Ari "as being greedy jerks").

[91] JX 45 at 1.

discount but believe we can get a FMV which will still be significantly lower than the value of the company 3-5 years from now. The potential is to make significant gains as FMV of today becomes 3 or 5x in future.

I would suggest that we issue the 1000 options at that level of FMV which will be in compliance with 409A and other regulations and will be much cleaner. Unfortunately we can[']t accommodate anything more at this point but open to changes later. This is our final position. We understand this may delay the closing.[92]

Brown expressed "disappoint[ment]" with Das's response but asked him to "confirm there [we]re no other open issues on Ari's revised Agreement and the form Stock Option Agreement."[93] Das responded with a "comprehensive list of open issues," including that Ari's "Options will Mirror proposal sent today for Benji."[94]

Despite Das's rejection of its option proposals, Katten pushed harder.[95] Within the hour, Bell sent Das another draft of Ari's Offer Letter that added back the Second Performance-Based Tranche:

Simultaneous with the entry of this offer letter, you will be granted options to purchase 2,000[1,000] shares of RateGain Travel Technologies Pvt. Ltd. under the grant agreement in the form accepted by you and a Special Bonus Agreement. Additionally, if you are employed by the Company upon the determination of EBITDA for the month ended March 2020 you shall also receive the following number of options: (A) if 50% or more but less than 60% of the EBITDA Threshold (as defined below) is attained 500 shares, (B) if 60% or more but less than 70% of the EBITDA Threshold is attained 600 shares, (C)

---

[92] *Id.*

[93] JX 46 at 1.

[94] JX 47 at 1.

[95] JX 51 at 1.

> if 70% or more but less than 80% of the EBITDA Threshold is attained 700 shares, (D) if 80% or more but less than 90% of the EBITDA Threshold is attained 800 shares, (E) if 90% or more but less than 100% of the EBITDA Threshold is attained 900 shares, and (F) if the EBITDA Threshold is met or exceeded 1,000 shares. For purposes hereof the "EBITDA Threshold" shall mean that for the month of March 2020 the Company shall achieve an EBITDA of $250,000.[96]

A few hours later, Bell sent Das a package of documents that again included a draft of Ari's Offer Letter, along with the latest version of Benji's employment agreement, which again included a Second Performance-Based Tranche.[97] That night, Brown reported internally that

> Katten ha[d] collected signatures from BCV and is prepared to exchange final documents (including those circulated by Diane earlier this evening) tomorrow morning for closing tomorrow. The only open item [wa]s the number of options, which Ari and Benji still need[ed] to discuss with [Chopra].[98]

On June 7, Das emailed Katten that the parties "still ha[d] [a] few issues to be ironed out,"[99] and attached revised drafts of Ari's Offer Letter, Benji's employment agreement, and Ari's and Benji's Stock Options Agreement.[100] For Ari's agreement, Das noted that RateGain "[had] communicated before [a] few times that there will

---

[96] *Id.* at 16.

[97] JX 52 at 87, 95.

[98] JX 53 at 2.

[99] *Id.* at 1.

[100] *Id.*

be no severance pay."[101]   On the issue of options for both Ari and Benji, Das reiterated that:

> 1000 Options are being granted at start.  For any additional options, the Company after each fiscal year end at its discretion will award additional options based on performance and achievement of Key Objectives subject to the availability of a Pool of Options in compliance with laws and regulations. Our intention is that we would issue additional options at the end of fiscal year based on Performance, however, we won't be able to be tied in an agreement now - Please see the language in the document.[102]

In an attached redlined draft of Ari's Offer Letter, Das also struck the "garden leave" provision in its entirety and replaced it with language permitting the company to terminate Ari for cause and "Non Performance,"[103] with Non Performance defined to mean

> at **any time following March 31, 2020** if the company's EBI[TD]A is less than (i) 70% of the EBI[TD]A target set forth for the 3 month period ending March 31, 2020 or (ii) 80% of the EBI[TD]A target for any fiscal quarter set forth as part of a Plan for a period thereafter.[104]

---

[101] *Id.*

[102] *Id.*

[103] Benji's employment agreement used the term "Nonperformance" while Ari's Offer Letter used the term "Non Performance."   Accordingly, the inconsistent spacing and capitalization herein is intentional.

[104] JX 61 at 2 (emphasis added).

Notably, RateGain's revised Offer Letter included a different definition of "Non Performance" than Benji's employment agreement, which continued to define Non Performance to mean

> at **any time following June _, 2020** if the Company's EBITDA is less than (i) 70% of the EBITDA set forth in the First Year Plan for the 3-month period ending March 30, 2020 or (ii) 80% of the EBITDA for any fiscal quarter set forth in the Plan for a period thereafter.[105]

Das emphasized that RateGain's "positions from [a] commercial point of view [we]re final from [their] side and [they] w[ould] not be able to do any concession in the same."[106]

Benji and Ari then spoke with Das and Chopra on the phone and tried one last time to make their case for a Second Performance-Based Tranche of options.[107] Das and Chopra told Ari and Benji that they should just "be happy" that the First Employment-Based Tranche options were "guaranteed to vest."[108] Chopra also sent Ari a WhatsApp message[109] expressing that he was

> not appreciative of how much we are being pushed despite us honoring every request in all openness. I told [Lang] we need to draw a line

---

[105] JX 63 at 5 (emphasis added).

[106] JX 53 at 2.

[107] Tr. (Ari) at 240:2–6. ("Q. Do you recall if you had any conversations with Mr. Das or Mr. Chopra before executing your offer letter? A. Just that final conversation about the second tranche of options.").

[108] *Id.* at 235:2–17.

[109] JX 54.

22

somewhere and that line is now drawn. I have asked [Das] to send an email with our final position. On your salary we discussed we would have a chat again in few months and reset it depending on role but I'm not open to committing to anything more at this point. There is a huge earnout for you guys already which we committed to help you make. On options we committed to 1000 and if everything works out and you guys are performing well it w[oul]d be in our interest to keep u motivated and give you more. We wont move and ready to now walk away.[110]

Later on June 7, Katten sent Das an email accepting RateGain's changes,[111] confirming that, "per your calls with Ari and Benji, we are going with the agreements you circulated this morning. . . . We're ready to go to closing with these."[112]

The Merger closed on June 11.[113] Benji's employment agreement and Ari's Offer Letter were executed the same day.[114] Ari's executed Offer Letter stated:

> **the Company can terminate your employment on the grounds of** Cause and **Non Performance** and you shall be relieved of all of your obligations (other than as set forth on Exhibit C). In case of Non Performance, the company is obliged to provide two (2) months notice. You can terminate the employment without good reason by giving two (2) months notice to the company ("notice period"). In such notice period both the company and you will work on a transition plan and complete a successful transition to the extent possible.
> . . .
> For the purpose of this Agreement **"Non Performance" shall mean at any time following March 31, 2020** if the company's EBI[TD]A is

---

[110] *Id.* (emphasis added).

[111] JX 56 at 1, 8.

[112] *Id.* at 1.

[113] PTO ¶ 21.

[114] *Id.*

23

less than (i) 70% of the EBI[TD]A target set forth for the 3 month period ending March 31, 2020 or (ii) 80% of the EBI[TD]A target for any fiscal quarter set forth as part of a Plan for a period thereafter. [115]

### E.     Ari Is Terminated Before His Stock Options Vest.

On March 27, 2020, RateGain notified Ari that BCV intended to "exercise its right to terminate [his] employment for Non Performance, as defined [in the Offer Letter], on April 1, 2020."[116]  After a two-month notice period required under the Offer Letter, Ari's employment ended on June 1, 2020, ten days before the one-year anniversary of his employment, when his options could have vested.

On March 27, Ari asked Das to extend his employment through June 11 so that his shares would vest.[117]  On April 12, Das told Ari that he could not extend his employment.[118]

### F.     Procedural History

Nearly three years later, on March 31, 2023, Plaintiff initiated this action through the filing of the Verified Complaint (the "Initial Complaint").[119]

---

[115] JX 61 at 1–2 (emphasis added).

[116] JX 65 at 1.

[117] JX 66 at 1.

[118] JX 67 at 1.

[119] Verified Compl. [hereinafter Compl.], Dkt. 1.

In the Initial Complaint, Plaintiff sought reformation of the Offer Letter and alleged a claim for breach of contract.[120] The Initial Complaint alleged that the parties initially expected the Merger to close on June 1, 2019, such that Ari's stock options would have vested on June 1, 2020, the earliest date BCV could terminate Plaintiff for Non Performance.[121] Instead, the Merger closed ten days late, pushing Ari's option grant date to June 11, 2019.[122] Plaintiff argued that the parties mistakenly failed to adjust the date Ari could be terminated for Non Performance commensurate with the ten-day closing delay.[123]

On May 15, Defendant moved to dismiss the Complaint (the "Motion").[124] On November 20, while serving as a Magistrate in Chancery, I issued a Final Report denying the Motion as to the request for reformation but dismissing the claim for breach of contract.[125]

---

[120] *Id.* ¶¶ 22–35.

[121] *Id.* ¶ 2.

[122] *Id.*

[123] *Id.* ¶¶ 24–26.

[124] Def. BCV Social LLC's Mot. to Dismiss Verified Compl., Dkt. 4.

[125] Dkt. 21.

Plaintiff filed a Motion for Leave to File an Amended Complaint on March 7, 2025,[126] which was granted on April 21.[127] Plaintiff filed his First Amended Verified Complaint (the "Amended Complaint") on April 23.[128] The Amended Complaint abandoned the delayed closing theory, alleging instead that the parties agreed Ari's options were guaranteed to vest in one year, but at the last minute, RateGain mistakenly inserted into the Offer Letter a provision permitting Ari's termination for Non Performance before the one-year anniversary of his employment when his options would vest.[129]

The Court held a three-day trial on July 1, 2, and 15, 2025.[130] Post-trial briefing was completed on November 3. Oral argument is unnecessary.

## II. ANALYSIS

Plaintiff seeks an order reforming the Offer Letter to provide that Ari could not be terminated for Non Performance prior to June 11, 2020, when his stock options would have vested had he remained employed by BCV.[131] In connection

---

[126] Pl.'s Mot. for Leave to Amend, Dkt. 72.

[127] Dkt. 81.

[128] First Am. Verified Compl. [hereinafter Am. Compl.], Dkt. 82.

[129] *Id.* ¶¶ 37–39.

[130] Dkts. 131–32.

[131] Am. Compl. at 9. Plaintiff also seeks an order declaring that he owns 120,000 vested options in RateGain stock. *Id.*

with his reformation claim, Plaintiff also seeks an award of damages, or alternatively, an order directing Defendant to specifically perform its obligations under the reformed Offer Letter by permitting Plaintiff to exercise his options to purchase RateGain stock at fair market value as of June 11, 2019, within six months.[132]

"The Court of Chancery has the power 'to reform a contract in order to express the 'real agreement' of the parties involved.'" *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *12 (Del. Ch. May 16, 2012) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002)). "The party seeking reformation 'must prove each of the required elements by clear and convincing evidence.'" *Glidepath Ltd. v. Beumer Corp.*, 2018 WL 2670724, at *10 (Del. Ch. June 4, 2018) (quoting *Cerberus*, 794 A.2d at 1152). "This is 'an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt.'" *Id.* (quoting *Cerberus*, 794 A.2d at 1151). "It 'requires evidence that "produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable."'" *Id.* (alterations in original) (quoting *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002)). "To establish proof by clear and convincing evidence means to prove something that

---

[132] *Id.*

is highly probable, reasonably certain, and free from serious doubt." *Id.* (quoting *Hudak*, 806 A.2d at 147). "Imposing this heightened burden for a claim for reformation 'preserve[s] the integrity of written agreements by making it difficult to modify executed contracts.'" *Id.* (quoting *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015)).

Plaintiff advances two theories in support of reformation—mutual mistake and unilateral mistake. In a case of mutual mistake, "the plaintiff must show that both parties were mistaken as to a material portion of the written agreement." *Cerberus*, 794 A.2d at 1151 (citing *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980)). For this theory to succeed, the Court "would have to find that the parties agreed" to and "sought to capture" Plaintiff's proposal, but then "utterly failed" to memorialize it in their final written agreement. *Valhalla P'rs II, L.P. v. Vistar Media, Inc.*, 2024 WL 5039563, at *21 (Del. Ch. Dec. 9, 2024), *aff'd*, 2025 WL 2814427 (Del. Oct. 3, 2025) (TABLE). In the case of unilateral mistake, "[t]he party asserting th[e] doctrine must show that it was mistaken and that the other party knew of the mistake but remained silent." *Cerberus*, 794 A.2d at 1151 (citing *Collins*, 418 A.2d at 1002). "Regardless of which doctrine is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement." *Id.* (citing *Hob Tea Room, Inc. v. Miller*, 89 A.2d 851, 857 (Del. 1952)).

28

**A.** **Plaintiff Failed To Prove By Clear And Convincing Evidence That The Parties Reached An Understanding That Ari's Options Were Guaranteed To Vest Or That RateGain Made A Mistake.**

To support his claim for reformation, Plaintiff argues that the parties reached an understanding in negotiations that Ari would receive "the same" options as Benji, and that both Benji's and Ari's options would be "guaranteed to vest."[133]

Plaintiff's argument is not borne out in the negotiation history—described in arguably too much detail above—which shows that the parties did not reach a firm agreement on any proposed terms until June 7, when the Offer Letter was finalized.[134] The parties negotiated the terms of Ari's employment over a five-day

---

[133] Pl. Ari Greenberg's Post-Trial Opening Br. at 29, Dkt. 139. Though not dispositive, Plaintiff's changing theories throughout this litigation undermine the credibility of his position. Plaintiff initially argued that the parties failed to make a ministerial update to the definition of Non Performance in his Offer Letter after a delay in closing, but now argue that the parties made a mistake in implementing their "true agreement" when RateGain rejected a draft Offer Letter that Katten proposed, made changes to it, and Katten (on behalf of Ari) accepted those changes. If the parties had, in fact, reached a mutual understanding not reflected in the contract, one would expect them to know what that understanding was *before* discovery revealed a theory to them.

[134] The negotiation history includes multiple examples in which RateGain "agreed" to terms but Plaintiff's advisors continued to push. For example, after RateGain offered Ari "the same equity as Benji," Katten proposed a draft Offer Letter that did not include an award of stock options like in Benji's agreement, but instead proposed an entirely different structure under which Ari would receive SARs. JX 20 at 5. As another example, despite RateGain's repeated refusal to grant Ari severance, nearly every Katten draft inserted a severance provision. *See e.g.*, JX 33 at 20. The record shows that although RateGain "agreed" to certain points throughout negotiations to narrow the issues in dispute, neither party believed it had reached a binding commitment until the final deal was struck.

period,[135] during which Ari's advisors exchanged numerous draft Offer Letters with RateGain, proposing and counter-proposing terms on salary, bonuses and special bonuses, duration of employment, severance, SARs, and performance- and non-performance-based stock options, among other things.[136]

Plaintiff argues that the parties reached an understanding that both Benji's and Ari's options would be "guaranteed to vest," cherry-picking communications in the record suggesting that the options were "committed," "guaranteed compensation" with value "on day 1."[137] According to Plaintiff, the parties intended for the First Employment-Based Tranche of options that Benji and Ari received to be "time-vested" rather than "performance-vested," like the Second Performance-Based Tranche. It is true that under the Offer Letter, the *grant* of options in the First Employment-Based Tranche was not tied to achieving EBITDA targets. As RateGain made clear throughout negotiations, however, under Indian law, those options could not *vest* until the grantee had been employed for one year.[138] While

---

[135] Katten sent RateGain a first draft of Ari's Offer Letter on June 3. JX 21 at 1. The Offer Letter was finalized on June 7. JX 59 at 1.

[136] *See* JX 21; JX 27; JX 31; JX 33; JX 37–41; JX 45–47; JX 51.

[137] Pl.'s Post-Trial Reply Br. at 11–12, Dkt. 145; JX 8 at 1; JX 54 at 4.

[138] *See, e.g.*, JX 14 at 1 ("[The options] will vest in 1 year, there is a mandatory vesting period defined by the Companies Act, hence irrespective any reason [they] will not vest before 1 year.").

the parties ensured that Benji's agreement committed to one year of employment before he could be terminated for Nonperformance, they did not do the same for Ari.

Plaintiff argues that the parties agreed to treat Benji and Ari "the same."[139] This argument fails on the facts. As an initial matter, negotiations over Benji's and Ari's respective employment differed in important ways. Benji's continued employment as BCV's CEO was essential to the deal; Ari's participation was not.[140] Benji's and Ari's agreements were not drafted from the same template—RateGain presented a long-form employment agreement to Benji while Katten prepared a briefer "offer letter" for Ari.[141] The terms of those agreements differed. Benji's agreement paid a higher salary than Ari's.[142] Benji's agreement entitled him to severance; despite Ari repeatedly pressing for severance, RateGain refused.[143] Benji's agreement provided for a three-year employment term; because Ari was

---

[139] Pl.'s Post-Trial Reply Br. at 4.

[140] Tr. (Das) at 378:12–379:3.

[141] *Compare* JX 4 *with* JX 20.

[142] *Contrast* JX 61 at 1 ("[Ari] will be paid a base salary . . . of $200,000 annually . . . ."), *with* JX 63 at 2 ("[Benji's] base salary shall be $250,000 per annum . . . .").

[143] JX 63 at 4 ("[Benji] shall be entitled to receive . . . an amount equal to his monthly Base Salary for a period equal to six (6) months . . . (the 'Severance Period')[.]"); *see* JX 53 at 1 ("Have communicated before [a] few times that there will be no severance pay [for Ari.]").

unsure whether he would stay with the company for even one year, his agreement did not.[144]

While Plaintiff now claims that the parties agreed to treat Benji and Ari "the same" with respect to an award of options, the documentary record shows that this is not how the parties' negotiations ultimately played out. Plaintiff relies heavily on a May 31 email from City Cap reporting that RateGain agreed Ari would receive "the same equity as Benji" and was open to finding a "work around" to ensure Ari's options would vest if he did not "continue" with the company.[145] Importantly, however, Katten then proposed a "work around" that was *not* based on the language in Benji's agreement.[146] Instead, Katten inserted an entirely different "garden leave" provision,[147] which RateGain rejected as "preposterous."[148] If the parties had reached a specific understanding that Benji's and Ari's options would vest at the

---

[144] JX 63 at 3 ("[T]he Employment Period shall end on March 31, 2022 . . . .").

[145] JX 18 at 1; *but see* Tr. (Das) at 381:4 ("This is not my language."); *id.* at 381:4–382:16 ("We agreed to grant him 1000 options, but not guaranteed vesting.").

[146] JX 33 at 1 ("This solution also has implication for Ari's agreement, particularly because of the Indian requirement that options cannot vest until one year of service is completed.").

Plaintiff characterizes RateGain's June 7 rejection of the "garden leave" provision as "last minute," but Katten first proposed that provision just two days earlier, on June 5. *Id.* at 19.

[147] JX 33 at 19.

[148] Tr. (Das) at 409:10–410:24 ("Q. So you had a conversation with David Modiano where you informed him that the garden leave provision was preposterous; is that correct? A. That's right.").

32

same time, Katten presumably would have inserted the same language in both agreements, but instead they over-asked for a better arrangement than Benji's.

Worn down by Benji's and Ari's demands, RateGain responded with a "final" counterproposal that rejected Katten's "garden leave" provision and replaced it with language permitting BCV to terminate Ari for "Non Performance" "at any time following March 31, 2020," attaching a redline that clearly reflected those changes.[149] Plaintiff's advisors, though "disappoint[ed]" with aspects of RateGain's proposal, confirmed to RateGain that Ari was "going with the agreements [RateGain] circulated" and was "ready to go to closing with these."[150] Ari then signed the Offer Letter.[151] That negotiation history does not support Plaintiff's theory that the parties agreed to treat Benji and Ari "the same" and simply failed to memorialize their agreement in the final contract.

The evidentiary record also does not support Plaintiff's position that RateGain was mistaken about the terms of its final proposal. At trial, both Das and Chopra credibly testified that RateGain was not mistaken about the terms of the Offer

---

[149] JX 53 at 2 ("The above positions from commercial point of view are final from our side and we will not be able to do any concession in the same."); *id.* at 30–31 ("'Non Performance' shall mean at any time following March 31 2020 . . . .").

[150] JX 56 at 1.

[151] JX 61 at 4.

Letter.[152]  Plaintiff argues that Das is not an attorney and must not have understood the implications of his own markup.[153]  Das was RateGain's lead negotiator, and the record does not support a finding by clear and convincing evidence that he did not understand his own proposal.  Rather, the record supports the opposite finding.  Plaintiff's mutual mistake theory therefore fails.

## B. Plaintiff Failed To Prove By Clear And Convincing Evidence That RateGain Knew Of Ari's Mistake And Stayed Silent.

Plaintiff's failure to prove by clear and convincing evidence that the parties reached a prior understanding not reflected in their final agreement dooms both his mutual and unilateral mistake theories.  Plaintiff also failed to prove unilateral mistake for another reason—RateGain had no reason to know of Ari's purported mistake.

Plaintiff argues that if RateGain was not itself mistaken about how its June 7 revisions to the Offer Letter would impact Ari's option vesting, RateGain must have been aware of Ari's mistake because RateGain knew it was important to Ari for his options to vest.[154]  The record does not support Plaintiff's argument that RateGain

---

[152] Tr. (Das) at 494:10–12 ("Q. Did you make a mistake with respect to Ari Greenberg's employment agreement?  A. No, absolutely not."); Tr. (Chopra) at 541:5–7 ("Q. So did you ever guarantee any specific employment terms to Ari Greenberg?  A. I did not.").

[153] Pl.'s Post-Trial Reply Br. at 2.

[154] *Id.* at 20–21.

knew Ari was mistaken about the Offer Letter. Again, RateGain proposed revisions to the Offer Letter clearly reflected in an attached redline, represented that those revisions were RateGain's "final" offer, and received a response back from Plaintiff's team of six advisors that the parties were "going with" the drafts RateGain proposed.[155] There is no "plainer way of communicating during negotiations than suggesting text and exchanging drafts of the contract itself." *Cambridge N. Point LLC v. Boston & Maine Corp.*, 2010 WL 2476424, at *12 (Del. Ch. June 17, 2010). Plaintiff failed to prove by clear and convincing evidence that RateGain knew Ari was mistaken about the contents of the Offer Letter he accepted and signed.

## III. CONCLUSION

Plaintiff failed to prove his entitlement to reformation of the Offer Letter. Judgment is entered for Defendant.

---

[155] Tr. (Das) at 410:5–12 ("At the end of the day, it was a two-page agreement. There were eight individuals, three lawyers, two City Capital officials. It is not that [the] amendment was done in a hundred-page document and done on the 82nd page. It was the first page of the first agreement [that] the amendment was done. So I absolutely don't believe there was a mistake by anyone here."); JX 56 at 1.